**UNITED STATES of America**

v.

**LANSDOWNE SWIM CLUB.**

Civ. A. No. 87–2929.

United States District Court, E.D. Pennsylvania.

May 10, 1989.

Harvey Handley III, Jane Taylor, Civ. Rights Div., U.S. Dept. of Justice, Washington D.C., for plaintiff.

Jeffrey L. Pettit, Philadelphia, Pa., for defendant.

## TABLE OF CONTENTS

I. BACKGROUND ............................................................ 789
II. PUBLIC ACCOMMODATION ............................................ 789
 A. PLACE OF ENTERTAINMENT ...................................... 790
 B. SNACK BAR AS COVERED ESTABLISHMENT ...................... 793
III. PRIVATE CLUB EXEMPTION ......................................... 795
 A. GENUINE SELECTIVITY ........................................... 797
 B. HISTORY OF CLUB .............................................. 802
 C. USE OF CLUB BY NONMEMBERS .................................. 803
 D. COUNTERVAILING CONSIDERATIONS ............................ 804
IV. PATTERN OR PRACTICE OF DISCRIMINATION ...................... 805
 A. BURDEN OF PROOF ............................................. 805
 B. STATISTICAL EVIDENCE ........................................ 807
 1. Legal Principles ......................................... 807
 2. Prima Facie Case ....................................... 808
 3. Defendant's Rebuttal .................................... 809
 C. REJECTIONS AND ADMISSIONS .................................. 811
 1. Burden of Proof ......................................... 811
 2. Allison Family ........................................... 812
 3. Ryan Family ............................................. 814
 4. Ivery Family ............................................ 815
 5. B Family ................................................ 817
 6. Johnson Family .......................................... 817
 7. Wilson Family ........................................... 817
 8. V Family ................................................ 817
 9. Number of Rejections .................................... 818
 D. DISCRIMINATION IN ORGANIZATION OF CLUB .................. 818
 E. DETERRENCE OF BLACK APPLICANTS ........................... 819
 1. Parker Family ........................................... 819
 2. Reaves Family ........................................... 819
 3. Allison Family .......................................... 820
 4. Ivery Family ............................................ 820
 5. M Family ................................................ 820
 F. OTHER ANECDOTAL EVIDENCE .................................. 821
 G. ADDITIONAL REBUTTAL EVIDENCE .............................. 822
V. CONCLUSIONS OF LAW ............................................... 823
VI. RELIEF ................................................................ 823

## MEMORANDUM

O'NEILL, District Judge.

The United States brought this action against the Lansdowne Swim Club ("The Club", "LSC"), alleging that it is a place of public accommodation that discriminates in its membership policies and practices against blacks on the basis of their race or color[1] in violation of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a to 2000a–6.[2] The Attorney General is authorized to bring this action on behalf of the United States. 42 U.S.C. § 2000a–5(a).[3] I

---

[1]. Originally, the United States also alleged national origin discrimination, *see Complaint* ¶ 7, but it did not pursue this claim. *See* Plaintiff's Pre–Trial Brief, at 1 n. 1. Consequently, I granted defendant's motion to dismiss all claims of discrimination except those involving discrimination against blacks. Transcript [hereinafter Tr.] 6/16/88, at 120–21.

[2]. Section 2000a(a) provides:
All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation ... without discrimination or segregation on the ground of race....

[3]. The Attorney General may bring a civil action to enforce Title II
Whenever [he] has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by [the Act], and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights [described in the Act].
42 U.S.C. § 2000a–5(a). This determination of reasonable cause to file suit is not reviewable. *See United States v. Gray,* 315 F.Supp. 13, 22–24 (D.R.I.1970) (citing, *inter alia,* 110 Cong.Rec. 15,895 (1964) (statement of Cong. Celler)).

have jurisdiction under 42 U.S.C. § 2000a–6(a) and 28 U.S.C. § 1345.[4]

LSC denies that it is a place of public accommodation, claims that it is a private club exempt from the coverage of Title II, and denies that it has discriminated. This Memorandum sets forth my findings of fact and conclusions of law as to these issues, as required by Fed.R.Civ.P. 52(a).

For the reasons that follow, I conclude that LSC is a place of public accommodation, is not a private club, and has engaged in a pattern or practice of discrimination against blacks in its membership policies.

## I. BACKGROUND

Lansdowne Swim Club is a Pennsylvania nonprofit corporation which owns and maintains facilities at the corner of Burmont Road and Baltimore Pike in Lansdowne, PA. Stipulation of Facts ("Stip.") 1, 3; Defendant's Exhibit ("DX") 1. It is the only swimming facility in Lansdowne, except for pools located on personal property. Stip. 6. LSC opened its facilities in 1958 (Stip. 2) and has been open every summer since then.

LSC's recreational facilities include a swimming pool with diving and sliding boards, a wading pool, lounging and sunbathing areas, shower and dressing facilities, ping pong tables, horseshoes, lounge chairs, umbrellas, picnic tables, and basketball and volleyball facilities. Stip. 21–31, 33–39. There is an entrance gate into the Club property off Burmont Road that leads to the parking area, where the basketball and volleyball equipment is located. Kressley Testimony, Tr. 6/17/88, at 18; Stip. 91. From the parking area, a ramp leads to an enclosed area where the pool is located. Kressley, at 18. The pool is accessible through a gate, which is staffed by LSC employees who admit members, associates and guests during normal pool hours. *See*

Cunningham Testimony, Tr. 6/16/88, at 4–5; Kressley, at 18–19. LSC leases a portion of its facilities to a concessionaire as a snack bar. Stip. 52.

The Club is managed by a twelve-person Board of Directors, including a President, Vice–President, Secretary and Treasurer. DX 3a (Art. II, Secs. 1, 2(a)). The shareholder members of the LSC are referred to in the Club's Bylaws as "active" members. Stip. 106; DX 2 (Art. IV, Sec. 1). Membership is evidenced by a capital share, or "bond", which has a par value of $250. Stip. 108; DX 1 (Art. 9). The Club limits its shareholder members to 500. Stip. 142. LSC also permits persons and families, known as "associates", to use its facilities for one season only. Stip. 107. The Club's general policy is that before being elected to membership an applicant must use the facilities of LSC for one swimming season as an associate. Stip. 110.[5]

Prior to 1979, all applicants for shareholder membership or associate privileges were required to be approved by the Membership Committee and elected to membership by the Board of Directors. Stip. 113–114; DX 2 (Art. IV, Sec. 2). Since 1979, all applicants must be approved by ninety percent of the shareholders present and voting at the annual meeting. Stip. 115–117. At this meeting, voting members cast ballots anonymously: an affirmative vote is cast by not listing the applicant's name on the ballot, and a negative vote is cast by listing the applicant's name. Stip. 118–119. Since 1985, the attendance of one of the applicant's sponsors at the annual meeting has also been required. Stip. 173–175.[6]

## II. PUBLIC ACCOMMODATION

Title II of the Civil Rights Act prohibits discrimination in places of public accommodation. An establishment is a place of public accommodation within the meaning

---

**4.** The proceedings currently before the Pennsylvania Human Relations Commission have been suspended pending the outcome of this suit. Plaintiff's Pre–Trial Brief, at 3. Therefore, I need not decide whether I must defer to those proceedings.

**5.** Exceptions to this policy exist in two instances: where the applicant is a member of a family group which is or was an active member of LSC, or where the applicant is a charter member of LSC. Stip. 111–112.

**6.** The Club's membership policies are discussed in detail *infra* pp. 798–99.

of Title II if its operations affect commerce and it is one of four categories of establishments which serve the public. 42 U.S.C. § 2000a(b). The categories relevant to this case are:

> any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises. *Id.* § 2000a(b)(2).

> any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment. *Id.* § 2000a(b)(3).

> any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment. *Id.* § 2000a(b)(4).

The operations of an establishment covered by section 2000a(b)(2) affect commerce if the establishment "serves or offers to serve interstate travelers or a substantial portion of the food which it serves ... has moved in commerce." *Id.* § 2000a(c)(2). The operations of an establishment covered by section 2000a(b)(3) affect commerce if the establishment "customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce." *Id.* § 2000a(c)(3). The operations of an establishment covered by section 2000a(b)(4) affect commerce if the establishment "is physically located within the premises of, or there is physically located within its premises, an establishment the operations of which affect commerce within the meaning of this subsection." *Id.* § 2000a(c)(4).

## A. PLACE OF ENTERTAINMENT

■ The Lansdowne Swim Club is a place of entertainment pursuant to section 2000a(b)(3). At its facilities, members, associates and guests (and members of the public in some instances), are amused and entertained by swimming, diving, sunbathing and "people-watching". They also consume snack food and beverages; talk to and associate with each other; play basketball, volleyball, ping pong and horseshoes; participate in and observe swimming and diving meets; and attend pool parties which sometimes include musical entertainment. *See* Stip. 20–47.

It is well-established that a place of entertainment includes an establishment where entertainment takes the form of direct participation in an activity or sport. *See Daniel v. Paul,* 395 U.S. 298, 306–08, 89 S.Ct. 1697, 1701–02, 23 L.Ed.2d 318 (1969);[7] *see also, e.g., Evans v. Seaman,* 452 F.2d 749, 751 (5th Cir.) (roller skating rink), *cert. denied,* 408 U.S. 924, 92 S.Ct. 2493, 33 L.Ed.2d 335 (1972); *Miller v. Amusement Enters., Inc.,* 394 F.2d 342, 350–51 (5th Cir.1968) (en banc) (amusement park);[8] *Brown v. Loudoun Golf & Country Club,* 573 F.Supp. 399, 402 (E.D.Va. 1983) (golf club); *United States v. Slidell Youth Football Ass'n,* 387 F.Supp. 474, 482 (E.D.La.1974) (youth football league). This interpretation of the term entertainment comports with its generally accepted meaning[9] and the overriding purpose of Title II, "to remove the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." *Daniel,* 395 U.S. at 307–08, 89 S.Ct. at 1702. In accordance with the holding and rationale of *Daniel,* the

---

7. The statute does not define "entertainment" and the legislative history of section 2000a(b)(3) is inconclusive. *See Miller v. Amusement Enters., Inc.,* 394 F.2d 342, 349 (5th Cir.1968) (en banc). In *Daniel,* the Supreme Court concluded that the "few indications of legislative intent" supported the view that entertainment extended to direct participation in an activity. *Daniel,* 395 U.S. at 306, 89 S.Ct. at 1701.

8. The rationale of the *Miller* decision was approved by the Supreme Court in *Daniel,* 395 U.S. at 308, 89 S.Ct. at 1702.

9. [T]he act of diverting, amusing or causing someone's time to pass agreeably; amusement. Synonyms for entertainment ... include the following: amusement, bodily enjoyment, fun, recreation, diversion, relaxation, sport, pleasure, play, merriment, festivity, celebration and revelry.

*Miller,* 394 F.2d at 351 (footnote omitted).

Court of Appeals for the Second Circuit concluded that a swim club is a place of entertainment. *Olzman v. Lake Hills Swim Club, Inc.,* 495 F.2d 1333, 1340 (2d Cir.1974).

Although LSC concedes that its swimming and other recreational areas constitute a place of entertainment, it contends that this designation is limited to its "recreational areas". Defendant's Brief in Support of its Proposed Findings of Fact and Conclusions of Law [hereinafter Defendant's Brief], at 4. Thus, LSC appears to be dividing its facilities into entertainment and nonentertainment areas. This bifurcation has no support in the plain language of the Act or the case law interpreting it. Once an establishment is determined to be a place of entertainment, the entire facility is identified as such. *See Daniel,* 395 U.S. 298, 89 S.Ct. 1697 (recreational facility including swimming, boating, sunbathing and picnicking areas, miniature golf, dancing facilities, and a snack bar); *Olzman,* 495 F.2d 1333 (swim club including swimming pool, wading pool, parking area and snack bar); *Miller,* 394 F.2d 342 (amusement park including mechanical rides, ice skating rink during winter, and small concession stand); *United States v. Johnson Lake Inc.,* 312 F.Supp. 1376 (S.D.Ala.1970) (recreational complex including swimming, picnicking and dancing areas, snack bar, pool tables, jukebox and gum machine); *Evans v. Laurel Links,* 261 F.Supp. 474 (E.D.Va.1966) (golf course with lunch counter); *cf. Martin v. United Way,* 829 F.2d 445, 449–50 (3d Cir.1987) (noting that the Supreme Court in *Daniel* "held that the entire facility was a place of entertainment 'affecting commerce'....").

As a place of entertainment, the operations of LSC affect commerce because LSC customarily presents sources of entertainment which move in interstate commerce. A "source of entertainment" is "the utilization of a device or an implement to engage in an entertaining activity". *Slidell Youth Football Ass'n,* 387 F.Supp. at 483. The sliding board at LSC, which the Club bought in 1968, was manufactured in Texas. Stip. 444(c), (d); Government's Exhibit ("GX") 108.[10] The sliding board is a source of entertainment because patrons use the slide to entertain themselves in the pool.

Participants in activities are also considered sources of entertainment for purposes of Title II. *See Scott v. Young,* 421 F.2d 143, 144 (4th Cir.), *cert. denied,* 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970); *Brown,* 573 F.Supp. at 402; *Johnson Lake,* 312 F.Supp. at 1380; *Laurel Links,* 261 F.Supp. at 477. Some of the persons who have used the Club's facilities are out-of-state residents. Stip. 51. For example, in 1986, the Club's guest receipts show that there were 117 visits by out-of-state guests; in 1987 there were 165 visits. *See* GX 106, 107.[11] Therefore, the sources of entertainment in this case are the sliding board and the Club's out-of-state visitors.

■ The pool chemicals,[12] the ladder and dolly,[13] and the payroll forms[14] are not sources of entertainment. Simply because swimming may be difficult or impossible without these materials does not make them sources of entertainment. Such a far-reaching interpretation would be contrary to the liberal but literal application of this term by other Courts, which have found various devices to be sources of en-

---

**10.** A sliding board is still on the premises. Stip. 32. I assume that this sliding board is the same as the one purchased in 1968; the parties have not asserted the contrary.

**11.** These numbers reflect the government's count of the visits. LSC counted 176 and 195 visits from out-of-state guests for 1986 and 1987, respectively. Defendant's Brief, at 8 n. 3. The precise numbers are not material to my disposition of this issue. Since they favor defendant, I will adopt the government's numbers. My attempt to make an independent count of these visits was frustrated because some of the copies

of the receipts were illegible and included abbreviations with which I was not familiar.

**12.** Some of the pool chemicals were purchased from a retailer in Georgia. Stip. 48; GX 111, 113, 115.

**13.** In 1987, a ladder and dolly were purchased from Triad Technologies, Inc., a New York corporation. GX 117.

**14.** LSC purchases payroll forms from a company in Connecticut. Stip. 49.

tertainment. *See Daniel,* 395 U.S. at 308, 89 S.Ct. at 1702 (paddle boats, boat and jukebox); *United States v. DeRosier,* 473 F.2d 749, 751–52 (5th Cir.1973) (jukebox, shuffleboard and pool table); *Seaman,* 452 F.2d at 751 (roller skates and their replacement parts); *Scott,* 421 F.2d at 144–45 (canoes and umbrellas); *United States v. Central Carolina Bank & Trust Co.,* 431 F.2d 972, 974–75 (4th Cir.1970) (golf equipment); *Durham v. Red Lake Fishing & Hunting Club,* 666 F.Supp. 954, 959 (W.D.Tex.1987) (boats, camping equipment and guns); *Slidell Youth Football Ass'n,* 387 F.Supp. at 484 (football equipment); *United States v. Vizena,* 342 F.Supp. 553, 554–55 (W.D.La. 1972) (jukebox, records, pool table and equipment).

The sliding board and the guests have "moved in commerce" because they originated in a state other than Pennsylvania, the state where they are presented. *See Daniel,* 395 U.S. at 308, 89 S.Ct. at 1702; [15] *see also Miller,* 394 F.2d at 351–52; *Vizena,* 342 F.Supp. at 555.

Finally, LSC "customarily" presents these interstate sources of entertainment. Customarily means "by custom", which is defined as "a form or course of action characteristically repeated under like circumstances", "a usage or practice that is common to many or to a particular place or class or is habitual with an individual," or a "repeated practice." *Laurel Links,* 261 F.Supp. at 477. Senator Magnuson, the Senate floor manager of Title II, stated that "customarily" meant "more than occasionally. Some significant percentage of the performances occurring in an establishment must move in interstate commerce if it is to come within the purview of title II." 110 Cong.Rec. 7406 (1964). Any of these definitions is satisfied here. LSC's sliding board is "not only 'customarily' presented, but permanently provided for the entertainment of the establishment's customers." *DeRosier,* 473 F.2d at 752. Moreover, the number of guests from out of state (13% of the guests in 1986 and 8% in 1987) is significant and the use of the facilities by them is regular. *Cf. Brown,* 573 F.Supp. at 402 (commerce requirement satisfied by annual golf tournament in which out-of-state professionals and club members play); *Evans,* 261 F.Supp. at 477 (commerce requirement satisfied by golf team from out-of-state playing on course once a year).

I do not accept LSC's attempt to nullify the significance of the attendance of out-of-state guests. First, I do not believe that the United States must prove that these guests actually used the pool in order to be considered sources of entertainment. The existing records reveal only who entered the premises, not who actually used the pool or the other facilities; therefore, it would be difficult, if not impossible, for the government to determine who used the facilities. Imposition of such a requirement also would run counter to the broad definition of entertainment that has been developed in the case law. Even if these guests did not participate in any activities at the Club, they would be sources of entertainment to others at the pool who are "people-watching," a popular amusement at any swimming pool or beach. *See Scott v. Young,* 307 F.Supp. 1005, 1007 (E.D.Va. 1969), *aff'd,* 421 F.2d 143. Second, the fact that LSC does not advertise for out-of-state patrons is not critical. In *Miller,* 394 F.2d 342, the case cited by defendant to support its contention that the government must show solicitation of out-of-state residents to satisfy the commerce requirement, evidence of advertising was necessary because there was no direct proof of the place where each patron originated. *Miller,* 394 F.2d at 349. In this case, however, LSC and the government stipulated that out-of-state residents patronized the facility; in addition, the government presented evidence of how many of them were admitted into the facility in recent years. A greater showing is not required.

**15.** In reaching this conclusion, the Court in *Daniel* noted that the Senate rejected an amendment that would have required that sources of entertainment "not come to rest within a State." *Daniel,* 395 U.S. at 308 n. 11, 89 S.Ct. at 1703 n.

11; *accord Miller,* 394 F.2d at 351–52 (interpreting legislative history and concluding that term "move" in commerce extends to entertainment that "has moved" in commerce).

My interpretation of the commerce requirement conforms to the intent of Congress in enacting Title II to "embrac[e] a broad, liberal construction that would reach the constitutional limits of the commerce clause." *Olzman*, 495 F.2d at 1340 n. 12 (citation omitted); *cf. Martin*, 829 F.2d at 449–50 (commerce requirement defined broadly citing, *inter alia, Daniel*). "While the overall effect of [LSC] on interstate commerce may be minuscule, this would not remove it from the coverage of the statute; when taken together with other clubs and pools and snack bars similarly situated the effect is no longer so trivial." *Olzman*, 495 F.2d at 1340 (citations omitted).

## B. SNACK BAR AS COVERED ESTABLISHMENT

■ LSC is an establishment within the premises of which is physically located a covered establishment, a facility engaged in selling food for consumption on the premises, and which holds itself out as serving patrons of that covered establishment, the snack bar.[16]

The snack bar at LSC is leased to a concessionaire who operates it. Stip. 52. Food and drink purchased from the bar cannot be taken from the snack bar and ticket booth areas. *See* GX 56 (1962 Rules and Regulations); GX 57 (1964 Pool Regulations); GX 58 (1978 Pool Regulations); GX 59 (1979 Pool Regulations); GX 60 (1986 Pool Regulations). The bar sells hamburgers, hot dogs, french fries, coffee, pizza, candy, tea, soda and hot chocolate to the members, guests and employees of the Club. Stip. 53–62.

When John and Carolyn Doucas operated the snack bar,[17] the carbonated "Coca-Cola" soft drinks sold at the snack bar were purchased from the Coca–Cola Bottling Co. of Philadelphia. Stip. 444(a). These beverages were manufactured using syrup concentrate produced in Baltimore, Maryland. Stip. 444(b). The coffee sold at the snack bar comes from beans grown outside the continental United States. GX 120.

Nonresidents of Pennsylvania have been served by the operators of the snack bar. Stip. 64, 66.

It is undisputed that the snack bar sells food for consumption on the premises. Stip. 53. Thus, the snack bar at the Club is a "facility principally engaged in selling food for consumption on the premises" pursuant to 42 U.S.C. § 2000a(b)(2). *Accord Daniel*, 395 U.S. at 303–04, 89 S.Ct. at 1700 (snack bar in recreational area); *Fazzio Real Estate v. Adams*, 396 F.2d 146, 150 (5th Cir.1968) (snack bar in bowling alley); *United States v. Beach Assocs., Inc.*, 286 F.Supp. 801, 806 (D.Md.1968) (restaurant adjoining beach club); *Johnson Lake*, 312 F.Supp. at 1378–81 (snack bar in recreational area).

The Club holds itself out as serving patrons of the snack bar: the bar serves the members, associates, guests and employees of LSC, Stip. 63–66; conversely, LSC provides entertainment to those who patronize the bar. *Cf. Adams v. Fazzio Real Estate*, 268 F.Supp. 630, 638–39 (E.D.La.1967), *aff'd*, 396 F.2d 146 (5th Cir.1968) (to satisfy "holding out" requirement, not necessary to show that primary function of bowling alley is to serve patrons of refreshment counter). Defendant disputes that the snack bar satisfies this requirement because the bar is not independent of the other facilities and, as such, "[t]here are no 'patrons' of the snack bar who are not already 'patrons' of LSC." Defendant's Brief, at 6. The Supreme Court's decision in *Daniel* refutes defendant's argument, however. In *Daniel*, the snack bar encompassed only a small portion of a larger recreational area, the Lake Nixon Club, to which blacks were denied admission. *See Daniel*, 395 U.S. at 301, 89 S.Ct. at 1699. Thus, it appears there were no patrons of the snack bar who were not already pa-

---

**16.** Obviously, the fact that the snack bar is covered under section 2000a(b)(2) does not automatically mean that the entire facility is covered. The requirements of 2000a(b)(4) and 2000a(c) must also be satisfied.

**17.** Mr. and Ms. Doucas have operated the snack bar for four of the past eight years. Stip. 444(a).

trons of the recreational facility. The Supreme Court did not discuss whether the Lake Nixon Club held itself out as serving patrons of the Club's snack bar. *See id.* at 302–08, 89 S.Ct. at 1699–1703. Moreover, the Court did not distinguish the decision in *Adams,* 396 F.2d 146, on which it relied to reach its conclusion that the snack bar brought the entire facility within the coverage of the Title II. *Daniel,* 395 U.S. at 305, 89 S.Ct. at 1701. Any distinction between the cases apparently was not material to the Court's conclusion.[18]

The operations of LSC's snack bar affect commerce because it serves and offers to serve interstate travelers. This standard is "satisfied by minimal evidence." *Adams,* 268 F.Supp. at 639 n. 19. It is undisputed that nonresidents have used the Club's facilities and have been served at the snack bar. The statute does not designate how many nonresidents must be served within a certain period of time in order to "affect commerce". I have already concluded that the number of out-of-state guests who have patronized LSC is significant. *See supra* p. 792. This requirement need not be fulfilled by showing solicitation of out-of-state residents. *Cf. Daniel,* 395 U.S. at 304, 89 S.Ct. at 1700; *Newman v. Piggie Park Enters.,* 256 F.Supp. 941, 951 (D.S.C.1966), *rev'd on other grounds,* 377 F.2d 433 (4th Cir.1967) (both cases showing that out-of-state residents were patrons of facility because it advertised). As I have previously stated, evidence of solicitation is simply a substitute for direct evidence of attendance by out-of-state residents, *see supra* p. 792; in this case the government need not show that LSC advertised for nonresident patrons because it has been stipulated that the snack bar has in fact served them.

I also find that the snack bar offers to serve interstate travelers because LSC offers to serve all persons who use the Club's facilities, including out-of-state guests. *See Daniel,* 395 U.S. at 304, 89 S.Ct. at 1700; *Gregory v. Meyer,* 376 F.2d 509, 510 (5th Cir.1967); *United States v. All–Star Triangle Bowl, Inc.,* 283 F.Supp. 300, 302 (D.S.C.1968); *Laurel Links,* 261 F.Supp. at 476.

Finally, the operations of the snack bar affect commerce because a "substantial" portion of the food served at the bar has moved in interstate commerce in accordance with 42 U.S.C. § 2000a(c)(2).[19] Substantial has been defined as "anything more than a minimal or insignificant amount". *Gregory,* 376 F.2d at 511 n. 1, *cited with approval in Daniel,* 395 U.S. at 305, 89 S.Ct. at 1701; *accord Newman,* 256 F.Supp. at 950–51 (Substantial is "something of real worth and importance; of considerable value; valuable; something worthwhile as distinguished from something without value or merely nominal.") (footnote omitted).

Ingredients in the soda and coffee sold at the snack bar originated outside Pennsylvania. I take judicial notice of the fact that many of the purchases at a swimming pool's snack bar, open during the hot summer months, include a cold drink. The primary cold drinks sold at the snack bar are "Coca–Cola" soft drinks, which contain an essential ingredient that has moved in commerce.

I recognize that in *Daniel,* 395 U.S. at 305, 89 S.Ct. at 1701, the Court found that a substantial portion of food had moved in commerce where "three of the four food items sold at the snack bar contain[ed] ingredients originating outside of the

---

**18.** Fazzio's was a bowling alley with a refreshment counter on the premises. *Adams,* 268 F.Supp. at 634. The refreshment counter was located behind the bowling lanes. *Id.* By intercom from the lanes, bowlers could order food from the counter, and spectators and bowlers could take food from the counter to a seating area near the alleys. *Id.* The defendant did not question that the bowling alley held itself out as serving patrons of the refreshment counter, *id.*

at 638; nevertheless, the Court discussed the "holding out" issue.

**19.** The government needs to show only that LSC either serves or offers to serve interstate travelers or that a substantial portion of the food served has moved in interstate commerce. *See Fazzio,* 268 F.Supp. at 639 & n. 17. For the reasons stated, the government has satisfied all of these requirements.

State." [20] This conclusion does not necessitate a finding that the government's showing is insufficient here. The Court did not set forth a minimum test of substantiality which would have to be satisfied in `the future. Without more specific guidance, I must give the term "substantial" its natural reading "[i]n light of the overriding purpose of Title II 'to remove the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public.' " *Daniel,* 395 U.S. at 307–08, 89 S.Ct. at 1702; *see also Miller,* 394 F.2d at 349.[21]

The operations of LSC affect commerce because the snack bar is physically located within its premises. "The snack bar's status as a covered establishment automatically brings the entire ... facility within the ambit of Title II." *Daniel,* 395 U.S. at 305, 89 S.Ct. at 1701.

For all of the above reasons, I find that the Club is a place of public accommodation within the meaning of 42 U.S.C. § 2000a(b)(4), as well as under § 2000a(b)(3).

**20.** *See also Adams,* 268 F.Supp. at 639 & n. 18 (substantiality not disputed; Court took judicial notice of origins of coffee, tea, bread); *Newman,* 256 F.Supp. at 950–51 (25–40% considered substantial amount); *Gregory,* 376 F.2d at 510–11 (substantiality found where total annual sales of $70,856, including coffee and tea sales of $5,000; hamburgers were facility's main dish, and 20–30% of beef came from out-of-state; other assorted products moved in commerce); *All-Star Triangle Bowl,* 283 F.Supp. at 301–02 & n. 4 (80% of food purchased considered substantial).

**21.** In *Miller,* the Court stated:

We do not read §§ 201(b)(3) and (c)(3) with a narrowed eye but with open minds attuned to the clear and strong purpose of the Act, namely, to secure for all citizens the full enjoyment of facilities described in the Act which are open to the general public. That Title II of the Civil Rights Act is to be liberally construed and broadly read we find to be well established.

*Miller,* 394 F.2d at 349 (footnote omitted).

In support of its interpretation of the commerce requirement, the Court added:

The Civil Rights Act was enacted with a spirit of justice and equality in order to remove racial discrimination from certain facilities which are open to the general public.

\* \* \* \* \* \*

## III. PRIVATE CLUB EXEMPTION

█ LSC claims that it is exempt from the coverage of Title II because it is a private club pursuant to 42 U.S.C. § 2000a(e).[22] That section provides, in pertinent part: "The provisions of [Title II] shall not apply to a private club or other establishment not in fact open to the public...." "[T]he test of whether a private club, or an establishment not open to the public, is exempt from title II, relates to whether it is, in fact, a private club, or whether it is, in fact, an establishment not open to the public." 110 Cong.Rec. 13,697 (1964) (remarks of Sen. Long).

LSC bears the burden of demonstrating that it is a private club. *See Anderson v. Pass Christian Isles Golf Club, Inc.,* 488 F.2d 855, 857 (5th Cir.1974); *United States v. Richberg,* 398 F.2d 523, 529 (5th Cir. 1968); *Nesmith v. YMCA,* 397 F.2d 96, 101 (4th Cir.1968); *Brown v. Loudoun Golf & Country Club, Inc.,* 573 F.Supp. 399, 402 (E.D.Va.1983); *Wright v. Cork Club,* 315 F.Supp. 1143, 1150 (S.D.Tex.1970). The defendant possesses this burden "because [it]

We do no more, today, than abide by this spirit embodied in law. We do no injustice to the language employed to reduce this spirit to writing. In fact to do otherwise would be an injustice, and would be to pay homage to that same inequality which the laws of our land, the Congress in enacting them, the courts in interpreting them, and the executive branch in its enforcement efforts have strived to eradicate.

*Id.* at 352–53.

**22.** In 1978, Dale Allison charged LSC with racial discrimination in violation of the Pennsylvania Human Relations Act (PHRA). Stip. 290–291. The Pennsylvania Human Relations Commission (PHRC) dismissed the complaint for lack of jurisdiction because it found that LSC was not a public accommodation. *See* DX 68. This determination does not affect my analysis under Title II because the PHRA is not coextensive with Title II. PHRA, 43 Pa.Stat.Ann. §§ 951–963 (Purdon 1964 and Supp.1988). The PHRA prohibits discrimination in "all the accommodations, advantages, facilities and privileges of any public accommodation...." *Id.* § 953. Section 954(*l*) defines a public accommodation, which does not include "any accommodations which are in their nature distinctly private." In any event, in deciding a question of federal law, I am not bound to follow a state agency's interpretation of state law.

claimed the shelter of an exception, ... and because the facts of proof are with [it]." *Richberg*, 398 F.2d at 529 (citations omitted).

The statute itself does not define a private club: "[t]he statute sets forth a factual test of sorts—'not in fact open to the public,' but it does not define 'private club'." *Cork Club*, 315 F.Supp. at 1150 (footnote omitted). The limited legislative history of section 2000a(e) provides me with only broad guiding principles. The private club exemption "must be examined in the light of the Act's clear purpose of protecting only 'the genuine privacy of private clubs * * * whose membership is genuinely selective * * *.' " *Nesmith*, 397 F.2d at 101–02 (citing remarks of Sen. Humphrey, 110 Cong.Rec. 13,697 (1964)). This exemption must also be examined in light of the remedial purpose of the Act, to eliminate racial discrimination in places open to the public. *See Cork Club*, 315 F.Supp. at 1150; *see also supra* p. 795 & n. 21 (discussing general remedial purpose of Title II).

The few decisions of the Supreme Court addressing the scope of section 2000a(e) are of limited value in developing a comprehensive definition of a private club, perhaps because they clearly involved shams. *See Cork Club*, 315 F.Supp. at 1151. In *Daniel v. Paul*, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969), the Lake Nixon Club was a recreational area in which 100,000 whites per season were given "membership" cards for paying a 25¢ "membership" fee. The Court concluded that this requirement was a subterfuge designed to avoid the impact of the Civil Rights Act. *Id.* at 302, 89 S.Ct. at 1699. The facility was "simply a business operated for a profit with none of the attributes of self-government and member-ownership traditionally associated with private clubs." *Id.* at 301, 89 S.Ct. at 1699. In *Sullivan v. Little Hunting Park*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), the facility was a community park and playground where membership could be obtained as a tenant of an existing member who had assigned his or her share. *Id.* at 234–35, 90 S.Ct. at 403. The Supreme Court concluded that

Little Hunting Park was not a private social club, but rather "a device functionally comparable to a racially restrictive covenant, ..." *Id.* at 236, 90 S.Ct. at 404. The organization had "no plan or purpose of exclusiveness. It is open to every white person within the geographic area, there being no selective element other than race." *Id.* Finally, in *Tillman v. Wheaton–Haven Recreation Ass'n*, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973), the Court followed *Sullivan* and concluded that a community swimming pool open to all whites within a geographic area was not a private club. *Id.* at 438, 93 S.Ct. at 1094. The Court reached this conclusion despite a restriction on the number of memberships and a formal membership procedure which required board or membership approval. *Id.* at 438–39, 93 S.Ct. at 1094.

Other Courts interpreting section 2000a(e) have not relied on a single test to determine if an establishment is a private club. Instead, they have weighed a variety of relevant factors. "Each factor is considered and either tips the balance for or against private club status." *Cork Club*, 315 F.Supp. at 1150; *see also Nesmith*, 397 F.2d at 101–02. I agree that a factor analysis is appropriate. The following factors are relevant to this determination and will be considered:

1. The genuine selectivity of the group in the admission of its members. *See, e.g., Tillman*, 410 U.S. at 438, 93 S.Ct. at 1094; *Nesmith*, 397 F.2d at 102; *Durham v. Red Lake Fishing & Hunting Club*, 666 F.Supp. 954, 960 (W.D.Tex.1987); *Brown*, 573 F.Supp. at 402–03; *United States v. Trustees of Fraternal Order of Eagles*, 472 F.Supp. 1174, 1175–76 (E.D.Wis.1979); *Cornelius v. Benevolent Protective Order of Elks*, 382 F.Supp. 1182, 1203 (D.Conn. 1974) (three-judge panel); *United States v. Jordan*, 302 F.Supp. 370, 375 (E.D.La. 1969);

2. The membership's control over the operations of the establishment. *See, e.g., Durham*, 666 F.Supp. at 960; *Jordan*, 302 F.Supp. at 375–76;

3. The history of the organization. *See, e.g., Eagles,* 472 F.Supp. at 1175; *Cornelius,* 382 F.Supp. at 1203;

4. The use of the facilities by nonmembers. *See, e.g., Eagles,* 472 F.Supp. at 1175; *Cornelius,* 382 F.Supp. at 1203;

5. The purpose of the club's existence. *See, e.g., Jordan,* 302 F.Supp. at 376;

6. Whether the club advertises for members. *See, e.g., Wright v. Salisbury Club, Ltd.,* 632 F.2d 309, 312–13 (4th Cir. 1980); *Eagles,* 472 F.Supp. at 1175; *Cornelius,* 382 F.Supp. at 1203; *Cork Club,* 315 F.Supp. at 1152;

7. Whether the club is profit or nonprofit. *See, e.g., Daniel,* 395 U.S. at 301, 89 S.Ct. at 1699; *Cornelius,* 382 F.Supp. at 1203;

8. The formalities observed by the club, e.g., bylaws, meetings, membership cards. *See, e.g., Nesmith,* 397 F.2d at 102; *Durham,* 666 F.Supp. at 960; *Jordan,* 302 F.Supp. at 376.[23]

Upon consideration of the factors listed above, I conclude that LSC has not established that it is a private club.

## A. GENUINE SELECTIVITY

The genuine selectivity of the membership process is the most important factor in ascertaining private club status. During the floor debate regarding section 2000a(e), Senator Humphrey stated: "We intend only to protect the genuine privacy of private clubs or other establishments whose membership is genuinely selective on some reasonable basis." 110 Cong.Rec. 13,697 (1964). Moreover, Courts construing this provision, including the Supreme Court, have concluded that genuine selectivity is an integral characteristic of a private club. *See, e.g., Tillman,* 410 U.S. at 438, 93 S.Ct. at 1094; *Sullivan,* 396 U.S. at 236, 90 S.Ct. at 404; *Salisbury Club,* 632 F.2d at 312; *Durham,* 666 F.Supp. at 960; *People of the State of New York v. Ocean Club,* 602 F.Supp. 489, 495 (E.D.N.Y.1984); *Brown,* 573 F.Supp. at 403; *Eagles,* 472 F.Supp. at 1175; *Cornelius,* 382 F.Supp. at 1203; *Cork Club,* 315 F.Supp. at 1151; *Jordan,* 302 F.Supp. at 375.[24]

A number of features reflect a club's genuine selectivity in membership practices: [25] the substantiality of the membership fee, *see Brown,* 573 F.Supp. at 403; the numerical limit on club membership (apart from the capacity of the facilities), *see Jordan,* 302 F.Supp. at 375; the membership's control over the selection of new members, *see Daniel,* 395 U.S. at 301, 89 S.Ct. at 1699 and *Jordan,* 302 F.Supp. at 375; the formality of the club's admission procedures, *see Brown,* 573 F.Supp. at 403; the standards or criteria for admission, *see Nesmith,* 397 F.2d at 102 and *Cork Club,* 315 F.Supp. at 1151; and whether and how many white applicants have been denied membership relative to the total number of white applicants, *see Tillman,* 410 U.S. at

---

**23.** I decline to adopt the standard set forth in the Equal Employment Opportunity Commission's "Policy Statement: Bona Fide Private Club Exemptions", which defines a "bona fide private membership club" under section 701(b)(2) of Title VII, 42 U.S.C. § 2000e(b)(2). The existing body of case law defining a private club under Title II provides me with the proper guidance to determine private club status. The opinion of the Court of Appeals for the Fifth Circuit in *Quijano v. University Federal Credit Union,* 617 F.2d 129, 131–32 (5th Cir.1980), which was followed by the EEOC in formulating its Policy Statement, clearly recognized and distinguished the body of case law developed under Title II.

I do not decide whether the result in this case would be different if I applied the Policy Statement as a guide, although I note that the Statement incorporates many of the factors listed above.

**24.** In two recent decisions upholding state public accommodations laws against First Amendment challenges, the Supreme Court has considered the organization's selectivity. *See Board of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 107 S.Ct. 1940, 1946, 95 L.Ed.2d 474 (1987) ("In determining whether a particular association is sufficiently personal or private to warrant constitutional protection, we consider factors such as size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship.") (citation omitted); *Roberts v. United States Jaycees,* 468 U.S. 609, 621, 104 S.Ct. 3244, 3251, 82 L.Ed.2d 462 (1984) ("The undisputed facts reveal that the local chapters of the Jaycees are large and basically unselective groups.").

**25.** These characteristics are not listed in order of importance.

438 & n. 9, 93 S.Ct. at 1094 & n. 9; *Salisbury Club*, 632 F.2d at 312; *Durham*, 666 F.Supp. at 960; *Ocean Club*, 602 F.Supp. at 495; *Brown*, 573 F.Supp. at 403; *Eagles*, 472 F.Supp. at 1176; *Jordan*, 302 F.Supp. at 375.

I conclude that LSC has not demonstrated that its membership procedures are genuinely selective on some reasonable basis.

Shareholder membership in LSC is evidenced by a capital share, or bond, which has a par value of $250. Stip. 108; DX 1 (Art. 9). The Club may have only 500 shareholder members at any given time. Stip. 142; DX 1 (Art. 9). In 1987, LSC had 494 such members. DX 76. The Board of Directors may provide for use of the Club's facilities by an unspecified number of individuals or families as associates, whose applications are processed and submitted to the membership for approval in the same manner as those of shareholder members. Stip. 143. The Club does not have a written limit on the number of associates it will admit for the year. Stip. 107, 109. The Board determines the number of associates to be accepted based on estimates of the number of active members who will not use the facilities during the ensuing season and the number of associates from the previous year who intend to reapply. Stip. 145–147. The number of associates admitted each year has varied. Stip. 144.[26]

A shareholder member pays $250 for the capital share or bond. DX 1 (Art. 9). Such a member also pays $32 annual dues for up to three family members and $14 for each additional family member. DX 8 (Minutes of Jan. 13, 1985). An associate pays $230 per season. *Id.* The government admits that the dues paid by members and associates are "not insignificant". Plaintiff's Pre–Trial Brief, at 25.

Prior to 1979, the Club's Bylaws stated that individuals or families desiring membership had to be approved by the Membership Committee and elected to membership by the Board of Directors. Stip. 113–114;

DX 2 (Art. IV, Sec. 2). The Bylaws further provided that each applicant for membership had to be sponsored by two active members and that the Board of Directors could make such rules and regulations "with respect to the means of determining the qualifications and the desirability of admitting applicants to membership as they deem in the best interests of the Club." DX 2 (Art. IV, Sec. 7). After a family requested membership, a person on the Membership Committee interviewed the family; at the time of the interview, the Club required that a written application be completed and payment for the stock be tendered. *See* GX 124, at 24, 32. The purpose of the interview was to explain to the applicant the Club's activities, rules and procedures, and to complete the application. Boyd Testimony, Tr. 6/17/88, at 54–55. The application form asked for name, address, phone, occupation, name of spouse, names and birthdates of children, and names of two sponsors. GX 89. Before 1969, applicants were required only to provide the names of their sponsors; no written recommendations were required. Beginning in late 1969, letters of reference were required from the sponsors. GX 72 (Minutes of Sept. 14, 1969).

Prior to 1979, the Club did not conduct any background investigation of membership applicants. GX 122, at 102. The record does not reveal that the Club had any articulated standards or criteria for approving applications. After taking an application, the Membership Committee forwarded it to the Board of Directors, who voted on it. GX 122, at 98–99. Until 1967, the Board of Directors voted on the applications in groups rather than individually. *See* GX 69 (Minutes of April 16, 1967).

Since 1979, applications have been voted on by the membership of the Club. At the annual meeting on November 15, 1978, the Club amended its Bylaws to provide that membership applications be approved by ninety percent of the members present and

---

**26.** LSC contends that associates are not members of the Club. I find this argument to be without merit, and I also note that this contention is inconsistent with the claim of private club status; if the associates are not members of the Club, they must be members of the public who use the pool as a public accommodation.

voting at an annual special meeting called to vote on applications. Stip. 115–117. This special meeting is held each May prior to the opening of the pool. Boyd, at 41.

Except for applicants who were accepted as associates in the previous year, a member of the Membership Committee visits applicants. The purposes of the interview are only to describe the Club in general, to explain the membership procedure and to verify the names and ages of any children in the applicant's family. Stip. 126–128. Other than the names and ages of the children, the Club does not provide voting members with any information about the interviews. Stip. 129. Applications for membership usually are completed by the interviewer and signed by the applicant at the applicant's residence. Stip. 153–156.

Prior to the vote by the general membership, letters of recommendation from two active Club members must be submitted and reviewed by the Membership Committee. Stip. 130–131. Ordinarily, these letters are not seen by the voting members prior to the vote and, other than the identities of the recommenders, no information about the contents of the letters is provided to these members. Stip. 132–133. Applicants are directed to submit the application, the required payment and letters of recommendation to the Membership Chairman by a stated deadline, which is imposed to allow sufficient time for preparation of a list of applicants for the annual voting meeting. Stip. 159–167.[27]

Applicants who have been interviewed, have completed an application, have sub-mitted letters of recommendation and have paid all fees are listed in a notice distributed to members in advance of the special meeting. Boyd, at 37–38. The only information given to the members prior to the meeting is the applicants' names, addresses, names and ages of children, and the identities of the recommenders. Stip. 125; see also GX 99–102 (Notices of Special Meeting of Members for 1983, 1984, 1985, 1986).

The Club does not investigate the background, character or financial status of the applicants. Stip. 134–139. The Club does not have an absolute requirement that applicants reside in a particular geographic area, as it has admitted nonresidents of Lansdowne as both members and associates. Stip. 148–150.[28]

Since 1958, LSC has admitted at least 1400 shareholder member families (Stip. 245) and a large number of associate families.[29] Before the Club opened, 418 applications for membership were accepted (Stip. 176); none were rejected (Stip. 19). Since it opened, only four applications of non-black families have been rejected. In 1967, the application of the M family [30] for membership was rejected by the Board of Directors. Stip. 249–251; DX 6 (Minutes of May 14, 1967). The E family's application for membership was also rejected that year. Stip. 246–248; DX 6 (Minutes of May 14, 1967). In 1982, the voting membership of LSC rejected the application of the B family for membership. Stip. 252–254. LSC rejected the application for associate privileges of the V family in 1984. Stip. 258–260.[31] The Club may have reject-

---

**27.** Prior to 1979, the Club did not impose a deadline for receiving and processing applications. Stip. 157–158.

**28.** When LSC was organized, membership initially was limited to residents of Lansdowne. DX 5 (Minutes of Sept. 18, 1957). The organizers resolved to open membership to nonresidents in order to achieve their initial goal of 300 members. *Id.* (Minutes of Jan. 5, 1958); Stip. 12. The Board of Directors then decided to give preference to Lansdowne residents over nonresidents on the waiting list. DX 5 (Minutes of June 5, 1958). In 1964, the Board decided to allow nonresident memberships which could not exceed ten percent of the total membership. *Id.* (Minutes of Mar. 1, 1964).

**29.** For example, in the last five years, the number of associates admitted has ranged from 90 to 120. Stip. 224 (90 in 1983), 230 (117 in 1984), 236 (94 in 1985), 238 (94 in 1986) and 244 (120 in 1987).

**30.** Where no member of a family testified, the family will be identified by letter. The names of the families appear in the Stipulation of Facts.

**31.** The E family was later granted associate (1970–1971) and shareholder membership (1972). Stip. 435–437. The M family had been granted associate privileges previously (1966), and was subsequently granted associate (1970, 1975) and shareholder membership (1976).

ed another application for associate privileges by a white family, but it cannot identify the name of that family. Stip. 262.

Although LSC requires substantial membership fees, places a limit on the number of shareholder members, and utilizes a formal admission procedure that has been controlled by the shareholder members since 1978, the process is not genuinely selective. LSC possesses no objective criteria or standards for admission. "If there is no established criteria for selecting members, the courts are reluctant to accept the claim of private status." *Cork Club*, 315 F.Supp. at 1151 (citation omitted). The applicants are not investigated in any meaningful way. "Where there is a ... policy of admission without any kind of investigation of the applicant, the logical conclusion is that membership is not selective* * *." *Nesmith*, 397 F.2d at 102 (citations omitted). The Club's interview of potential members is not probing and, moreover, provides no information to voting members that is useful in making an informed decision as to whether the applicant and his or her family would be compatible with the existing members. Although recommendations are required, their contents are not revealed to the members.

The fact that recommendations are required is an insufficient demonstration of selectivity. *See, e.g., Tillman*, 410 U.S. at 433, 438, 93 S.Ct. at 1092, 1094; *Salisbury Club*, 632 F.2d at 312; *Brown*, 573 F.Supp. at 403; *Ocean Club*, 602 F.Supp. at 495. The existence of substantial dues also does little to strengthen LSC's claim of selectivity. In other Courts, clubs with substantial dues were not able to sustain their burden of demonstrating that they were private clubs. *See, e.g., Tillman*, 410 U.S. at 433 n. 2, 93 S.Ct. at 1092 n. 2 ($375); *Olzman*, 495 F.2d at 1335 ($2000); *Brown*, 573 F.Supp. at 400, 403 ($750).

A country club with a membership procedure similar to LSC failed to show that it was a private club. *Ocean Club*, 602

F.Supp. at 495. The Court described the Ocean Club's membership procedures as follows:

The application for membership is uninformative. It seeks only the name and address of the applicant, the type of business, names of the immediate family and the listing of two club members as references. [footnote omitted]. No investigation is made of the applicant. An interview is conducted by one member of the membership committee or at times by [two other club officials]. The interview did not probe into the background and character of the applicant, but rather explained the facility and services available to members. Sometimes applicants were admitted without any interview. The club failed to establish any eligibility standards, i.e., economic, social, geographical, professional.

*Id.* I find that the procedures of LSC are similarly lacking in substance.

In support of its assertion of selectivity, LSC emphasizes that members must be voted in by the membership. Defendant's Trial Memorandum, at 12–13. As I have discussed, under *Tillman* this procedure by itself is not sufficient to establish selectivity.

The lack of selectiveness in LSC's membership process is dramatically revealed by the results it yields: in the thirty-year history of LSC, only three non-black families have been denied membership and one non-black family (perhaps two) has been denied associate privileges. *See supra* p. 799 n. 30. As in *Sullivan*, 396 U.S. at 236, 90 S.Ct. at 404, "[t]here is no plan or purpose of exclusiveness. It is open to every white person ..., there being no selective element other than race." *See also Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d 1333, 1336 (2d Cir.1974) (applying *Tillman* and *Sullivan* to swim club). Courts have generally found no selectivity where few whites have been rejected. *See Tillman*,

---

Stip. 425–426, 427, 430–431. The B family had been granted associate privileges twice previously, in 1980 and 1981. Stip. 339–341. The V family had been granted associate privileges continuously from 1977 through 1983. Stip.

439–440. In addition, following the rejection of the Vs, Membership Committee Chairman Richard Burke gave at least one of the V children a director's pass. Burke Testimony, Tr. 6/16/88, at 38–39, 51–52.

410 U.S. at 438 & n. 9, 93 S.Ct. at 1094 & n. 9 (only one white applicant rejected in eleven years); *Salisbury Club,* 632 F.2d at 312 (no white residents rejected and only three white nonresidents rejected); *Nesmith,* 397 F.2d at 101 (over 99% of white applicants accepted); *Durham,* 666 F.Supp. at 956 (only two whites rejected in fifty years); *Ocean Club,* 602 F.Supp. at 495 (100 applications and no rejections); *Brown,* 573 F.Supp. at 400 (evidence that four whites denied membership); *Eagles,* 472 F.Supp. at 1176 (within one-year period, only three rejections out of 1,011 applications).

Other facts buttress the conclusion that LSC is not selective in its membership practices. First, although the Club imposes a limit of 500 on the number of shareholders, the number is not so small as to suggest exclusivity simply by virtue of the Club's size. Facilities with smaller memberships were not able to sustain their burden of demonstrating that they were private clubs. *See Tillman,* 410 U.S. at 433, 93 S.Ct. at 1092 (325 members); *Brown,* 573 F.Supp. at 400 (450 members); *Durham,* 666 F.Supp. at 956 (80 members). Second, there is no limit to the number of associates admitted in a given year and the determination of this number year-to-year appears not to be governed by a desire for selectivity, but rather by a concern for sufficient space. *See supra* pp. 797–98. Third, associates, who constitute approximately one-fifth of the users of these facilities, must satisfy the same entrance requirements as active members and yet have no voice in the selection of new members. *See Ocean Club,* 602 F.Supp. at 495–96. Fourth, members were voted upon by group until 1967.

I cannot accept defendant's argument that the end result, i.e., the number of applicants denied membership compared to the number who have applied, is irrelevant to my determination of genuine selectivity. A formal membership procedure has little meaning when in practice it is not selective, even if the process permits a member to vote against an applicant. *See Salisbury Club,* 632 F.2d at 312 (citing *Tillman*); *Durham,* 666 F.Supp. at 960 (citing *Salisbury Club*); *Brown,* 573 F.Supp. at 403

(citing *Nesmith*). A process whereby "the members ... decide for themselves on whatever grounds they deem suitable whether or not they wish to associate with the applicant", Defendant's Brief at 54, is a process that has no purpose or plan of exclusiveness.

The few establishments that Courts have found to possess a selective process are readily distinguishable from LSC. In *Cornelius,* 382 F.Supp. at 1203, three judges of the District of Connecticut found that a local Elks club was selective because it had clear admission standards: "only white male citizens of the United States who believe in God and who live within the jurisdictional limits of the local lodge were eligible for membership." In addition, the club had extensive procedures for investigating the suitability of an applicant: background questions were answered, sponsorship by a member was required, the applicant appeared before an investigating committee who issued a report to the general membership, and the membership voted on the applicants. *Id.*

The failure of the *Cornelius* Court to discuss how many applicants had been refused admission, assuming such evidence existed, is of no consequence. The Court relied on the Supreme Court's decision in *Tillman* as support for its consideration of the selectivity factor. *Tillman* recognized the importance of selectivity in substance and form. The Court in *Cornelius,* 382 F.Supp. at 1203, also cited *Jordan,* 302 F.Supp. at 375–76, which found that the number of applicants rejected was relevant to determining the selectiveness of a club.

I also note that *Cornelius* is inapposite to this case for two other important reasons. First, the legislative history demonstrated an intent to exempt local fraternal organizations in general and the Elks in particular from Title II. *Cornelius,* 382 F.Supp. at 1204. The *Cornelius* Court cited *Moose Lodge v. Irvis,* 407 U.S. 163, 171, 92 S.Ct. 1965, 1970, 32 L.Ed.2d 627 (1972), which exempted a local chapter of a national fraternal organization. *Cornelius,* 382 F.Supp. at 1204. Second, the plaintiff in *Cornelius* stipulated that the organization

was a private club within the meaning of the Act. *Id.*

The decision of the Court of Appeals in *Kiwanis Int'l v. Ridgewood Kiwanis Club,* 806 F.2d 468 (3d Cir.1986), *cert. dismissed,* 483 U.S. 1050, 108 S.Ct. 362, 97 L.Ed.2d 812 (1987), which held that a local Kiwanis Club was not a public accommodation, is also distinguishable. The Court reached its result pursuant to the New Jersey Law Against Discrimination and the applicable New Jersey case law, not Title II. LSC does not argue that Title II is coextensive with the New Jersey Act, which exempts any "bona fide club ... which is in its nature distinctly private." *Id.* at 472.

In *Kiwanis,* the Court emphasized the importance of selective membership practices, including formal membership procedures, to the determination whether the club was private. In particular, the Court noted that sponsorship by a current member was required, a requirement also followed by LSC. *Id.* at 475. However, the Court highlighted a number of facts which differentiate the Kiwanis Club from LSC: the Kiwanis Club had only twenty-eight members, with ten individuals having been members for over twenty years; only twenty members had been admitted in the last ten years; the club imposed local membership requirements and limited solicitation was conducted.[32] *Id.* at 475–76. The Court concluded that "[t]his evidence of membership practices and policy does not reflect an open and unrestricted invitation to the community at large to join [the club]." *Id.* at 476.[33] In contrast, for the reasons I have already stated, LSC is an unselective organization that provides an open and unrestricted invitation to the families of Lansdowne and the surrounding area.[34]

My finding that LSC does not have a genuinely selective membership process is a finding that weighs heavily against its contention that it is private. Other factors also support my conclusion that LSC is not a private club.

### B. HISTORY OF CLUB

The history of an organization ordinarily is relevant to show whether it was created to avoid the effect of civil rights legislation. *See, e.g., Daniel,* 395 U.S. at 301–02, 89 S.Ct. at 1699–1700; *Brown,* 573 F.Supp. at 402; *Eagles,* 472 F.Supp. at 1175. There is no such contention here; in fact, LSC was created prior to the enactment of Title II. However, the history of LSC is relevant for another reason; the origins of LSC suggest that it was intended to serve as a "community pool" for families in the area and not as a private club.[35]

Matthew Richards, a founder and former secretary of LSC, testified that LSC was created as a community pool to serve, in particular, the neighborhood children. Richards Testimony, Tr. 6/16/88, at 125. The minutes of May 22, 1957 also illustrate that the founders intended to form a community swim club. GX 61. When LSC was organized, the Borough of Lansdowne had no community pool. Richards, at 135. The Club was intended to be open to members of the public provided they could pay the membership fee. *Id.* at 136.

Initially, the organizers sent out a questionnaire to Lansdowne residents to determine their interest in membership. Stip. 7–8; GX 62; GX 63. A membership drive seeking 300 members was commenced in 1957. Stip. 9–11. The organizers solicited door-to-door. Richards, at 125–26. They

---

**32.** In *Kiwanis,* the Court of Appeals did not discuss the number of rejections. Defendant contends that it follows that the number of rejections is irrelevant to the determination of selectivity. For the reasons stated *supra* p. 801, I find this argument to be without merit.

**33.** Although the Court of Appeals discussed these factors in the context of defining a public accommodation, it concluded that "[i]f a club is 'bona fide' ... and if it is not a 'place of public accommodation' because of its selective membership practices, it must be private as that term

is used in the statute." *Kiwanis,* 806 F.2d at 476 (citing, *inter alia, Brown,* 573 F.Supp. 399; *Eagles,* 472 F.Supp. 1174).

**34.** As discussed *infra* pp. 805–23, this invitation was limited to non-black families.

**35.** By use of the term "community pool", I do not mean that the Borough of Lansdowne was involved in the formation or construction of LSC. I use this term to characterize the nature of the organization when it came into being.

also held recruitment meetings that were open to the public. Stip. 13–14. Residents and nonresidents of Lansdowne were solicited. Stip. 12, 15, 16, 17. Nonresidents were solicited when the initial goal of 300 members did not appear to be attainable. DX 5 (Minutes of Jan. 5, 1958). No black residents of Lansdowne were solicited, however. Richards, at 136. Prior to the opening of the facilities, 418 families were accepted for membership. Stip. 176. No families were rejected. Stip. 19; Richards, at 135. These historical facts reflect the public nature of LSC, a nature which does not appear to have changed since the opening of the pool.

The government contends that another event in the Club's history is relevant; that the 1978 changes in the membership procedures were motivated by Dale Allison's filing of a complaint against LSC with the Pennsylvania Human Relations Commission (PHRC).

On or about March 14, 1978, Dale Allison filed a complaint against the Lansdowne Swim Club with the PHRC, alleging racial discrimination in a place of public accommodation, resort, or amusement, in violation of the PHRA. Stip. 290–291. On November 15, 1978, LSC amended its Bylaws to provide for approval by ninety percent of the membership. Stip. 116. John Boyd, who was a member of the Board of Directors, testified that the reason for the proposal was that "[t]here was a feeling among the club's members that the membership procedure should be made somewhat more democratic and the members themselves be given a larger voice in the selection of its members, ..." Boyd Testimony, Tr. 6/17/88, at 35–36. I credit this testimony. Prior to this time, concern for a more democratic process had been expressed by at least one shareholder member but no action was taken by the Board. *See* Kidder Testimony, Tr. 6/15/88, at 109–113.

On this evidence, I find that the government has not proved its contention that the changes in the Bylaws were motivated by the filing of the Allison complaint.

## C. USE OF CLUB BY NONMEMBERS

Nonmembers are permitted to use LSC's facilities in a number of ways which, taken together, undercut LSC's claim that it is a private club. First, members and associates may bring an unlimited number of guests into the pool area provided that they pay the guest fee,[36] they do not interfere with the enjoyment of the facilities by others and they are not residents of Lansdowne. Stip. 67–71. Second, persons temporarily residing at a member's home may purchase a House Guest Membership for $10 a week per person, which enables the guest to use the facilities unaccompanied by a member. GX 60 (1986 Regs). Third, the Club Director is issued free passes which, in his discretion, may be lent to nonmembers to use the facilities unaccompanied by a member. GX 125, at 24–27. Fourth, each year LSC hosts two or three swim meets and two or three diving meets between its teams and other teams in the league in which it competes. Stip. 44, 45, 72, 75.[37] LSC does not prohibit attendance of the general public at these meets. Stip. 73, 76. LSC does not attempt to verify whether the spectators of the meets are members, guests of members, swim team participants or members of the public. Stip. 74. These meets are held at the Club during normal pool hours and require LSC to close to its general membership. Stip. 77–80. Fifth, each year LSC sponsors two to four pool parties, also called "splash" parties, for its members, associates and their guests. Stip. 81. Members and associates are permitted to sell tickets, without restriction, to persons who do not belong to the Club. Stip. 82–84. At these parties, LSC provides refreshments and either live or recorded music. Stip. 46–47. Sixth, the basketball and volleyball facilities located

---

**36.** In 1986, the guest fee was $2.00 on weekdays and $2.50 on weekends and holidays. GX 60 (1986 Regs).

**37.** Of course, the swimming and diving meets, in and of themselves, do not make a pool nonprivate. These meets, which are an integral part of a swim club, necessarily require the attendance of nonmembers of the Club.

on the Club's parking lot are open to the public: LSC does not verify whether persons entering the parking lot are members, associates, guests, employees of LSC or members of the public. Stip. 91–101.[38] Seventh, since 1978 LSC has permitted the Lansdowne Boys' Club to conduct its annual Christmas tree sale, which is open to the public, on LSC's parking lot. Stip. 102–105.

Considered together, these intrusions on the privacy of the Club support the image of a community swimming pool serving residents of the surrounding neighborhood and not merely the Club's members. As stated by the Court in *Cork Club*, 315 F.Supp. at 1151–52:

> If the facilities which are sought to be integrated are regularly used by nonmembers, who are not bona fide guests of members, then the facilities cannot be said to be private. 'A genuine private club limits the use of club facilities or services to members and bona fide guests.' (citations omitted). It defeats the very purpose of a private club to allow the indiscriminate use of club facilities by nonmembers on a regular basis. (footnote omitted).[39]

Every year, the facilities of LSC are regularly used by nonmembers, which I believe contradicts its purported desire to be exclusive.

## D. COUNTERVAILING CONSIDERATIONS

LSC does possess certain characteristics that support its claim that it is a private club. Its shareholder members control the operations of the Club through their election of the Board of Directors and their ownership of shares. LSC is a nonprofit organization. Stip. 1; DX 1. The Club's Articles of Incorporation state that one of the purposes of the Club's existence is "[t]o maintain a private club for civic and social enjoyments of a moral, educational and legal nature." DX 1 (Art. 3). LSC has never advertised its activities or facilities. Richards Testimony, Tr. 6/16/88, at 132–33; Boyd Testimony, Tr. 6/17/88, at 35.[40] LSC collects dues, issues membership cards, and has regular meetings of the membership and of its Board.

In view of all of the evidence relevant to LSC's private club status, I find that these considerations are insufficient to sustain LSC's burden to establish that it is a private club. Under similar circumstances, other Courts have found that the purported club was not private. *See Brown*, 573 F.Supp. at 402–03;[41] *Ocean Club*, 602 F.Supp. at 494–96;[42] *Durham*, 666 F.Supp.

---

**38.** It appears that this area of the Club is continuously open to the public during the swim season. Such public use is not characteristic of a private club. *Cf. Durham*, 666 F.Supp. at 960 (Club's roads open to public); *Ocean Club*, 602 F.Supp. at 496 (public permitted to use tennis courts advertised, used and controlled by Club).

**39.** In determining whether state public accommodations laws violate the First Amendment, the Supreme Court also has considered the use of the club by nonmembers. *See New York State Club Ass'n v. City of New York*, —— U.S. ——, 108 S.Ct. 2225, 2233–34, 101 L.Ed.2d 1 (1988); *Rotary Club*, 107 S.Ct. at 1943, 1946–47.

**40.** I note, however, that the Club did engage in a solicitation drive prior to the opening of the pool which effectively advertised the pool to the surrounding community. *See supra* pp. 802–03.

**41.** In *Brown*, the Court concluded that the Loudoun Golf and Country Club, a nonprofit golf club, had not sustained its burden of showing that it was entitled to private club status. The requirements for membership were payment of a $750 initiation fee, a written application form with the endorsement of two members, and approval by the club's board of directors. The bylaws also required a member to be of "good moral character". The club had a membership ceiling of 450 members. Apart from special tournaments, which took place three times a year, only members and guests were permitted to use the course. The club solicited new members by encouraging its members to seek new applicants. During the entire history of the club, only a few whites had been rejected. The Club was controlled by shareholders, who elected the board of directors. Nonshareholders could not participate in electing the board. *Brown*, 573 F.Supp. at 400.

**42.** The Court found that the Ocean Club was a public accommodation and not a private club because the membership procedures were not selective, *see supra* p. 800; the associate members, who constituted almost half of the club's total membership, had no control over the club; the club advertised; and the club offered use of its tennis courts to the public. *Ocean Club*, 602 F.Supp. at 494–96.

at 959–60.[43]

For the above reasons, I conclude that LSC is not entitled to exemption from Title II as a private club.

## IV. PATTERN OR PRACTICE OF DISCRIMINATION

### A. BURDEN OF PROOF

To succeed on the merits, the government must prove that LSC has engaged in a pattern or practice of discrimination against blacks. 42 U.S.C. § 2000a–5(a). Proof of a pattern or practice requires proof of disparate treatment, that is intentional discrimination, not simply disparate impact. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977);[44] *see also* 110 Cong.Rec. 14,270 (1964).[45] In this case, the government concedes that it must prove intentional dis-

crimination. Transcript of Oral Argument, Tr. 9/21/88, at 6–7.

The words "pattern or practice" are not terms of art; they are to be given their generic meanings. *See United States v. West Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir.1971); *United States v. Slidell Youth Football Ass'n*, 387 F.Supp. 474, 480 (E.D.La.1974); *United States v. Real Estate Dev. Co.*, 347 F.Supp. 776, 783 (N.D. Miss.1972). The government must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. It [must] establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855; *see also Bazemore v. Friday*, 478 U.S. 385, 398, 106 S.Ct. 3000, 3008, 92 L.Ed.2d 315 (1986) (per curiam) (Brennan, J., writing for majority, concurring in part); *Cooper v. Federal Reserve*

---

**43.** The Court found that the club at issue in *Durham* was not private. The Red Lake Fishing and Hunting Club was a nonprofit corporation that owned 400 acres of land. The purpose of the club was to "establish and maintain a fishing, hunting and boating club and to engage in the conservation of wild life and to purchase and own land and bodies of water necessary to accomplish this purpose." *Durham*, 666 F.Supp. at 956. The corporation owned the property, although the member was permitted to make improvements on his or her lot. Dues were collected from members every year. *Id.*

The membership procedures of the Red Lake Club are analogous to those of LSC, which defendant admits. *See* Defendant's Brief, at 55. The maximum number of members was eighty. The qualifications for membership were completion of an application, payment of a fee, receipt of a recommendation by a membership committee, and acceptance by the entire membership (less than five negative votes). Only two white applicants for membership had ever been rejected, both for specified reasons. Other whites had been accepted into membership, although they had received negative votes. *Durham*, 666 F.Supp. at 956.

The characteristics of the Red Lake Fishing and Hunting Club differ in some respects from those of LSC, but their similarities are sufficient to support my conclusion that LSC has not sustained its burden to demonstrate that it is a private club.

**44.** I find that the standard of proof set forth in *Teamsters* is applicable to this case, even though *Teamsters* was a government action brought under Title VII, not Title II. The statute authoriz-

ing suits by the Attorney General under Title VII, 42 U.S.C. § 2000e–6, like § 2000a–5, requires that a pattern or practice be proved. The legislative history of the Civil Rights Act also suggests that the definition of a pattern or practice is the same under either title. *See* 110 Cong.Rec. 14,270 (1964); *id.* at 14,239.

The Court of Appeals has adopted the *Teamsters* standard in class actions alleging a pattern or practice under Title VII. *See Croker v. Boeing Co.*, 662 F.2d 975, 990–91 (3d Cir.1981); *cf. Green v. USX Corp.*, 843 F.2d 1511, 1525–30 (3d Cir.1988) (applying *McDonnell–Douglas* and *Burdine, see infra* pp. 811–12, to private class action). The elements of proof in a private class action suit are the same as in a suit brought by the government. *See Cooper v. Federal Reserve Bank*, 467 U.S. 867, 876 n. 9, 104 S.Ct. 2794, 2799 n. 9, 81 L.Ed.2d 718 (1984); *Presseisen v. Swarthmore College*, 442 F.Supp. 593, 599 (E.D.Pa.1977).

The parties agree that the *Teamsters* analysis is applicable to this case. Defendant's Brief, at 12–13; Plaintiff's Pre-trial Brief, at 15.

**45.** In disparate treatment, the defendant "simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, ..." *Teamsters*, 431 U.S. at 335–36 n. 15, 97 S.Ct. at 1854 n. 15. In contrast, disparate impact involves "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* Discriminatory motive need not be proven in such cases.

*Bank,* 467 U.S. 867, 875–76, 104 S.Ct. 2794, 2799–2800, 81 L.Ed.2d 718 (1984); *Presseisen v. Swarthmore College,* 442 F.Supp. 593, 599 (E.D.Pa.1977). As stated by Senator Humphrey: "[A] pattern or practice [is] present only where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature." 110 Cong.Rec. 14,270 (1964); *accord id.* at 14,-239 (statement of Sen. Humphrey); *id.* at 15,895 (remarks of Cong. Celler); *United States v. Ironworkers Local 86,* 443 F.2d 544, 552 (9th Cir.), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); *West Peachtree,* 437 F.2d at 227.

The government's prima facie case may consist of "statistics alone ... or ... a cumulation of evidence, including statistics, patterns, practices, general policies, or specific instances of discrimination." *EEOC v. American Nat'l Bank,* 652 F.2d 1176, 1188 (4th Cir.1981), *cert. denied,* 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982); *see also Croker v. Boeing Co.,* 662 F.2d 975, 991 (3d Cir.1981) (statistical evidence and individual testimony); *Coates v. Johnson & Johnson,* 756 F.2d 524, 532 (7th Cir.1985) (statistical evidence buttressed by evidence of general policies or specific instances of discrimination). The use of statistics in pattern or practice cases was approved by the Supreme Court in *Teamsters,* 431 U.S. at 337–39, 97 S.Ct. at 1855–56, and *Hazelwood School Dist. v. United States,* 433 U.S. 299, 306–09, 97 S.Ct. 2736, 2740–42, 53 L.Ed.2d 768 (1977). "Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination." *Hazelwood,* 433 U.S. at 307–08, 97 S.Ct. at 2741.

Specific instances of discrimination may be used to bring the "cold numbers convincingly to life." *Teamsters,* 431 U.S. at 339, 97 S.Ct. at 1856. In its prima facie case the government need not show that

each person for whom it seeks relief was injured by the defendant's discriminatory conduct. *See id.* at 360, 97 S.Ct. at 1867; *see also Franks v. Bowman Transp. Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). *See generally* B. Schlei & P. Grossman, Employment Discrimination Law 1322–24 (2d ed. 1983) [hereinafter Schlei & Grossman]. The issue of individual relief ordinarily does not arise until it is proven that the defendant followed a policy or practice of discrimination. *See Teamsters,* 431 U.S. at 342–43 n. 24, 360–62, 97 S.Ct. at 1858–59 n. 24, 1867–68.[46] However, if the government offers the testimony of a purported victim to buttress its prima facie case, it must show that the victim was subject to disparate treatment within the framework of *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See infra* p. 811.

I must consider all of the evidence as a whole, both statistical and nonstatistical, to determine whether the government has satisfied its initial burden. *See American Nat'l Bank,* 652 F.2d at 1189. "Neither statistical nor anecdotal evidence is automatically entitled to reverence to the exclusion of the other." *Coates,* 756 F.2d at 533.

If the government makes a prima facie showing, the defendant then has the burden to demonstrate that the government's proof is either inaccurate or insignificant, or to provide a nondiscriminatory explanation for the discriminatory result. *See Teamsters,* 431 U.S. at 360, 97 S.Ct. at 1867; *Croker,* 662 F.2d at 991; *Coates,* 756 F.2d at 532 (citing, *inter alia, Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977)). The defendant need only produce evidence that raises a genuine issue of fact as to whether it discriminates. *See EEOC v. Sears, Roebuck & Co.,* 839 F.2d 302, 309 (7th Cir.1988). Defendant "may endeavor to impeach the reliability of

---

**46.** The rationale for this bifurcation of proof is that if a pattern or practice is shown it is presumed that all of the victims suffered from discrimination. *See Franks,* 424 U.S. at 772, 96 S.Ct. at 1268. A later proceeding is held to determine whether an individual is entitled to

specific relief. *See Teamsters,* 431 U.S. at 360–61, 97 S.Ct. at 1867–68. No later proceeding was or will be held in this case because the individual rejections were proffered to support a pattern or practice. *See infra* p. 811.

the statistical evidence ... may offer rebutting evidence, or ... may disparage in arguments or in briefs the probative weight which the [government's] evidence should be accorded." *Dothard,* 433 U.S. at 338–39, 97 S.Ct. at 2731 (Rehnquist, J., concurring).

"[I]f the defendant[ ] [has] not succeeded in having a case dismissed on the ground that [the government has] failed to establish a prima facie case, and [has] responded to the [government's] proof by offering evidence of [its] own, the factfinder then must decide whether the [government has] demonstrated a pattern or practice of discrimination by a preponderance of the evidence." *Bazemore,* 478 U.S. at 398, 106 S.Ct. at 3008. The burden of persuasion remains at all times with the government. *See Sears, Roebuck,* 839 F.2d at 309; *Croker,* 662 F.2d at 991.

■ A pattern or practice of discrimination may be found even if a defendant does not discriminate uniformly. *See Ironworkers Local 86,* 443 F.2d at 552; *Real Estate Dev. Corp.,* 347 F.Supp. at 783–84. Moreover, no minimum number of acts is required. *See West Peachtree,* 437 F.2d at 227 ("The number of blacks actually turned away or discriminated against is not determinative."); *Real Estate Dev. Corp.,* 347 F.Supp. at 783 ("The number of Negroes rejected is not determinative of the presence of such a pattern or practice."). However, sporadic or isolated incidents of discrimination are insufficient. *See Goff v. Continental Oil Co.,* 678 F.2d 593, 596–97 (5th Cir.1982) (three instances of individual discrimination); *Ste. Marie v. Eastern R.R. Ass'n,* 650 F.2d 395, 406 (2d Cir.1981) ("While the definition of a pattern or practice is not capable of a precise mathematical formulation, ... more than two acts will ordinarily be required.") (citing, *inter alia, Presseisen,* 442 F.Supp. at 608); *see also Croker,* 662 F.2d at 995 (plaintiff class proved no more than isolated or sporadic discriminatory acts).

■ Upon consideration of the foregoing legal principles and of the facts as found below, I conclude that the government has sustained its burden of proving that the Lansdowne Swim Club has engaged in a pattern or practice of discrimination.

## B. STATISTICAL EVIDENCE

■ The government presented the testimony of Chapman Gleason, Senior Statistician for the Department of Justice Employment Litigation Section, to support its prima facie case.

### 1. Legal Principles

Although the Supreme Court has sanctioned the use of statistics to prove a pattern or practice of discrimination, *see supra,* p. 806, it has cautioned: "[S]tatistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *Teamsters,* 431 U.S. at 340, 97 S.Ct. at 1856–57; *Hazelwood,* 433 U.S. at 312, 97 S.Ct. at 2744 (citing *Teamsters* ); *see also Croker,* 662 F.2d at 995; *Presseisen,* 442 F.Supp. at 599. *See generally* Schlei & Grossman, at 1331. Recently, the Supreme Court again expressed its reluctance to accept statistical evidence: "Nor are courts ... obliged to assume that plaintiffs' statistical evidence is reliable. 'If the [defendant] discerns fallacies or deficiencies in the data offered by the plaintiff, he is free to adduce countervailing evidence of his own.' " *Watson v. Fort Worth Bank & Trust,* —— U.S. ——, 108 S.Ct. 2777, 2789, 101 L.Ed.2d 827 (1988) (plurality opinion) (citations omitted). Such weaknesses may include "small or incomplete data sets", "inadequate statistical techniques", or other deficiencies which may emerge from the unique facts of the case. *Watson,* 108 S.Ct. at 2790.

The Court of Appeals also has been cautious in relying on statistical evidence in the discrimination context. In *Mazus v. Department of Transp.,* 629 F.2d 870, 875 (3d Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981), the Court noted: "Statistical comparisons, if they are to have any value, must be ... free from variables which would undermine the reasonableness of the discrimination in-

ferences to be drawn. Such evidence must be critically examined and all facts and circumstances must be considered." (citations omitted). In *Bryant v. International Schools Servs., Inc.*, 675 F.2d 562, 573 (3d Cir.1982), the Court observed that "the story statistics tell depends, not unlike beauty, upon the eye and ear of the beholder, and ... we must apply a critical and cautious ear to one dimensional statistical presentation."

### 2. Prima Facie Case

As a preliminary matter, I find that the government's expert, Chapman Gleason, was qualified to give expert testimony concerning statistical analyses of applications for membership in LSC. *See* GX 133 (Curriculum Vitae of Chapman Gleason); Tr. 6/16/88, at 59–62 (voir dire of Gleason). I initially made this determination during trial. Tr. 6/16/88, at 60, 62.

Mr. Gleason recommended that first-year associate privileges be used as the basis for the statistical analyses because one cannot become a member of the Club without first becoming an associate. Gleason Testimony, Tr. 6/16/88, at 64, 93–94. On the government's recommendation, Mr. Gleason used the admittance data for blacks and non-blacks rather than the individual ballots. *Id.* at 64–65, 93.[47]

This data revealed that from 1979 to 1987, 379 non-black families applied to become first-year associates and none were rejected by the membership,[48] whereas six black or part-black families applied and all but one were rejected.[49] With the aid of computer software, Mr. Gleason performed chi-square statistical analyses of this data.[50] The computer printouts of these analyses are set forth in GX 48 and GX 50, exhibits which will be admitted into evidence. Mr. Gleason chose the chi-square test because it is widely known in the statistical literature, it is an appropriate method to compare two proportions, and it can be easily transferred to a standard deviation test. Gleason, at 67–68. Mr. Gleason testified that the chi-square value was 319, which corresponded to approximately six-

---

47. To compile this data, Mr. Gleason relied on summaries prepared by one of the U.S. Attorneys, which were based on the government's request for admissions and LSC's responses. Although these responses were not made a part of the record, LSC represents that the Stipulation of Facts 215–244, which is a part of the record, accurately reflects its responses to the request for admissions. Defendant's Brief, at 40 n. 17.

48. LSC contends that the admittance data is inaccurate, *inter alia*, because it is unknown whether all of the applicants granted first-year associate privileges were families who had no black or part-black members. I disagree. Members of the Club and Club officials consistently testified that they were unaware of any black members of the Club. *See* Burke Testimony, Tr. 6/16/88, at 55–56; Boyd Testimony, Tr. 6/17/88, at 53; Weiss Testimony, Tr. 6/16/88, at 21–22, 24; Kidder Testimony, Tr. 6/15/88, at 119; Biscontini Testimony, Tr. 6/15/88, at 139; *see also* Cassie Testimony, Tr. 6/15/88, at 104.

49. I find that the Johnson family is part-black and therefore I will not admit GX 49 or GX 51, which were analyses based on the assumption that the Johnsons were white.

Susan Johnson is white, her husband (now deceased) was black, and her child Jared is part-black. Her late husband's race and Jared's mixed race were known to the membership when Ms. Johnson and Jared first applied to join the Club. Ms. Johnson testified that a neighbor who recommended her knew her late husband's race and that she thought his race was common knowledge. Johnson Testimony, Tr. 6/17/88, at 14. At the Club's informational interview, the interviewer asked if a picture in her home was that of her late husband and she replied yes. *Id.* Richard Burke, who was on the Club's Board of Directors and is now Membership Chairman, coached Jared at the Boys' Club and knew that, when the Johnsons first applied, Ms. Johnson had been dating a black man. Burke Testimony, Tr. 6/16/88, at 46–47. Ms. Johnson acknowledged that she was dating a black man near the time when she first applied for associate privileges and that she believed this was known to everyone in the Boys' Club. Johnson, at 16–17.

50. I previously reserved ruling on LSC's motion to strike Mr. Gleason's testimony relating to statistical tests other than the chi-square. Tr. 6/16/88, at 78. The basis for the objection was that such testimony failed to conform to the government's answers to defendant's second set of interrogatories, which stated that the chi-square was the only statistical test relied on by Mr. Gleason. *Id.* at 76–78. Following defendant's objection, I directed the government to limit his testimony to the results of this test. *Id.* at 78. I will not consider any testimony unrelated to the chi-square test and thus will grant defendant's motion to strike to that extent.

teen standard deviations from the results expected in a race-neutral selection process. *Id.* at 81; GX 48. Based on these calculations, Mr. Gleason concluded that the chi-square was highly statistically significant and that the selection process for first-year associate members at LSC was not race-neutral. Gleason, at 84.

█ As a general rule, a standard deviation of greater than two or three excludes chance as an explanation for the underrepresentation of blacks.[51] *See Castenada v. Partida,* 430 U.S. 482, 496–97 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977); *Hazelwood,* 433 U.S. at 311 n. 17, 97 S.Ct. at 2743 n. 17. *But see Watson,* 108 S.Ct. at 2789 n. 3 (Supreme Court has not suggested any particular number of standard deviations to determine whether plaintiff has made out prima facie case of employment discrimination); D. Baldus & J. Cole, Statistical Proof of Discrimination § 9.03, at 294–95 & nn. 12–13 (1980), 169–76 (Supp.1987) [hereinafter Baldus & Cole] (cautious application of "two-to-three standard deviations" approach).

### 3. Defendant's Rebuttal

Defendant argues, *inter alia,* that the government's statistical evidence is insignificant because the number of black applicants was too small to yield a valid result using the chi-square test. I agree.[52]

The Supreme Court has recognized that small sample size may detract from the value of statistical evidence. *See Teamsters,* 431 U.S. at 339–40 n. 20, 97 S.Ct. at 1856–57 n. 20 (citing *Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 620–21, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974)); *see also Watson,* 108 S.Ct. at 2790 (an example of weakness in statistical evidence is small data set). Apart from this general admonition, however, I "have no guidance as to how small is too small other than [my] own best judgment." *American Nat'l Bank,* 652 F.2d at 1193–94.

The danger posed by small samples is that they may produce short-term results that would not hold over the long run, and thus erroneously may be attributed to discriminatory practices rather than to chance. *See* Baldus & Cole §§ 9.1, 9.11, 9.12; *Commonwealth v. Rizzo,* 466 F.Supp. 1219, 1229 (E.D.Pa.1979); *see also Williams v. Tallahassee Motors, Inc.,* 607 F.2d 689, 693 (5th Cir.1979), *cert. denied,* 449 U.S. 858, 101 S.Ct. 159, 66 L.Ed.2d 74 (1980). Recognizing this danger, a number of Courts have invalidated or failed to give weight to statistics derived from small samples. *See Rizzo,* 466 F.Supp. at 1228–32; *see also Fudge v. Providence Fire Dept.,* 766 F.2d 650, 657–58 (1st Cir.1985); *Soria v. Ozinga Bros.,* 704 F.2d 990, 995

---

**51.** As explained by the Fourth Circuit Court of Appeals in *American Nat'l Bank,* 652 F.2d at 1191:

[The standard deviation analysis] tests the hypothesis that underrepresentation of a protected minority group in any sample made up of a protected and a nonprotected group (binomial distribution) might be attributable to normal fluctuations of chance rather than to discriminatory design. The "standard deviation" is the measure of the predictable fluctuation in a random selection process. The difference between actual ("observed") numbers of the protected group in such a sample and the number that would be "expected" in a perfectly proportional process of selection from the appropriate pool can then be expressed in numbers of standard deviations.... As standard deviations increase numerically, the probability of chance as the cause of revealed underrepresentation of course diminishes. To the extent the probability of chance is shown to be quite small, the

legal inference of discrimination based upon a rough legal assessment that disparities are manifestly "gross" or "substantial" is thus "scientifically" confirmed.

**52.** Applying the analysis set forth in *Teamsters, see supra* pp. 805–07, I conclude that, although the statistics create an inference of discrimination, the defendant has rebutted it. Others, using a slightly different approach, would conclude that, because of the weakness of the statistical evidence, the government has failed to create an inference of discrimination and thus no rebuttal is necessary. *See, e.g., Dickerson v. United States Steel Corp.,* 472 F.Supp. 1304, 1308–1314 (E.D.Pa.1978). Regardless of the analysis used, the result in this case is the same: the statistical evidence proffered by the government is not probative of discrimination.

Because of my invalidation of the statistical evidence on this basis, I need not reach LSC's other contentions relating to Mr. Gleason's testimony. *See* Defendant's Brief, at 38–42.

(7th Cir.1983); *Eubanks v. Pickens–Bond Constr. Co.*, 635 F.2d 1341, 1347–48, 1350 (8th Cir.1980); *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409, 412–13 (8th Cir.1975); *Ochoa v. Monsanto Co.*, 473 F.2d 318, 319–20 (5th Cir.1973) (per curiam); *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Serv. Comm'n*, 482 F.2d 1333, 1338–39 (2d Cir. 1973). *But see* Baldus & Cole, § 4.123, at 53 (Supp.) (sample size affects validity of actual applicant data but should not lead Court to disregard the data altogether); *Boston Chapter NAACP, Inc. v. Beecher*, 504 F.2d 1017, 1020–21 & n. 6 (1st Cir.1974) (existence of small applicant pool, caused by test which discouraged members of protected class, does not totally invalidate statistical evidence), *cert. denied.* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *United States v. Yonkers*, 609 F.Supp. 1281, 1290 (S.D.N.Y.1984) ("[defendant] should not be permitted to question statistically significant finding on basis of small sample size where the small size of sample was caused, at least in part, by [defendant's] own conduct."). *See generally* Schlei & Grossman, at 1375–76 & n. 34 (citing cases); Baldus & Cole, § 9.12, at 177–82 (Supp.) (suggesting an analysis for evaluation of statistical evidence based on small sample size).

In Baldus & Cole, a treatise relied upon by statisticians in discrimination cases (*see* Gleason Testimony, Tr. 6/16/88, at 103–04), the authors state that for comparing selection rates the chi-square test will generally be preferred "if the sample sizes are not too small." Baldus & Cole § 9A.1, at 323. To determine the appropriate sample size for this test, the authors refer to the Dixon and Massey text (p. 242), which states: "The minimum theoretical frequency for the two by two table should not be less than 5." Gleason, at 104. During cross-examination, Mr. Gleason admitted that some of the theoretical frequencies in his

chi-square analyses did not exceed five. Gleason, at 103, 109, 110–12. The computer software used by Mr. Gleason recognized the danger of using theoretical frequencies of less than five in a chi-square test. Upon performing its analyses of the admissions data of the Club from 1979 to 1987 (identifying the Johnson family as part-black), the computer issued a warning: "50% of the cells have expected counts less than 5. Chi-square may not be a valid test." DX 86.[53] Mr. Gleason stated that all the analyses performed on this data contained similar warnings. Gleason, at 106–112.

Mr. Gleason testified that, notwithstanding these warnings, the theoretical frequencies did not need to be greater than five for the chi-square test to be valid. *Id.* at 103–05. However, he seemed to acknowledge the limitations of this test with such a small sample size by emphasizing that he did not rely solely on this test to conduct his analyses. *Id.* at 105–06.

I conclude that the small sample used in the government's study renders the chi-square test invalid. Because the analyses based on other tests are not admissible, *see supra* p. 808 n. 50, the statistical evidence is not probative of a pattern or practice of discrimination.

I also note that there is another problem with this evidence related to small sample size. As discussed *infra* p. 818, LSC had a discriminatory reputation among blacks in the Lansdowne community and LSC deterred blacks from applying to the Club. The creation of a chilling effect through these means distorted the applicant pool, thus weakening the statistical proof. *See* Baldus & Cole, § 4.124; *see also* Schlei & Grossman, at 1348–51 (among factors affecting quality of applicant flow data are inadequate recruiting efforts and application procedures that chill protected

---

**53.** On cross-examination, Mr. Gleason stated that counsel had instructed him to delete this warning on the government's exhibits. Gleason, at 108, 110, 112. However, the warnings were present on the initial computer analyses, which were provided by the government to the defendant prior to trial. *See* DX 86, 87.

I find it distressing that such an instruction should have been given by an officer of this Court representing the government of the United States with respect to evidence which the government intended to offer to this Court.

group applicants); *cf. Dothard v. Rawlinson,* 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977) (statistical showing of disparate impact need not always be based on applicant flow data because pool may be affected by discouragement).

Notwithstanding the invalidity of the government's statistical evidence, anecdotal evidence may satisfy the government's burden of proof. When the statistics are flawed, "strong evidence of individual instances of discrimination becomes vital to the plaintiff's case." *Sears, Roebuck,* 839 F.2d at 311 (citations omitted). It is to this evidence that I now turn.

### C. REJECTIONS AND ADMISSIONS

I find that the rejections of the black and part-black families who sought membership in the Club, the Allisons (1983 and 1986), Ryans (1984 and 1986) and Iverys (1986), are highly probative of a pattern or practice of discrimination, and that the admissions of the Johnsons (1981 and 1982) and the Wilsons (1984 and 1985) and the rejection of the V family (1984) do not counter this finding.

#### 1. Burden of Proof

The government claims that each rejection of a black or part-black family who applied to the Club was racially motivated and that, taken together, the rejections constituted a pattern or practice. It appears that other Courts have not yet determined the precise standard of proof applicable to individual claims of disparate treatment offered to support a pattern or practice of discrimination. In *Presseisen,* 442 F.Supp. at 600–01, my colleague Judge Bechtle suggested that each individual claimant must satisfy the tripartite test for individual disparate treatment set forth in *McDonnell–Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). I agree. The *McDonnell–Douglas* framework was developed to evaluate claims of intentional discrimination against individuals and has

been applied to a private action brought pursuant to Title II. *See Durham v. Red Lake Fishing & Hunting Club,* 666 F.Supp. 954, 957 (W.D.Tex.1987). Moreover, this framework is a flexible one that can be readily adapted to different contexts. *See Furnco Constr. Co. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *Jackson v. United States Steel Corp.,* 624 F.2d 436, 440 (3d Cir.1980). The parties agree that *McDonnell–Douglas* is applicable. Defendant's Brief, at 14; Transcript of Oral Argument, Tr. 9/21/88, at 8.

In this case, a prima facie case of discriminatory rejection is made out if the government shows, by a preponderance of the evidence, that: 1) the rejected family was black or part-black; 2) it applied and qualified for membership; 3) it was rejected; and 4) openings for membership sought by the black or part-black family were available and were filled by non-black families. *See McDonnell–Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Satisfying the elements of the prima facie case was not intended to be onerous. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).[54] For example, direct evidence of discriminatory intent is not required. *See United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714 n. 3, 717, 103 S.Ct. 1478, 1481 n. 3, 1483, 75 L.Ed.2d 403 (1983); *see also Green v. USX Corp.,* 843 F.2d 1511, 1526–27 (3d Cir.1988) (explicit demonstration of employer's "invidious purpose" or "hostile motive" not required to show intent; rather, there must be "abundant circumstantial evidence from which the inference of discriminatory treatment can be reasonably drawn....").

To rebut this prima facie case, LSC must articulate a legitimate, nondiscriminatory reason for the family's rejection. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. The reason must be clearly articulated and reasonably specific, and must be supported by the introduction of admissible evidence.

---

**54.** *See also Whack v. Peabody & Wind Eng'g Co.,* 595 F.2d 190, 193 n. 11 (3d Cir.1979): "This Court has not been overly demanding in the proof required for a *prima facie* case. Usually, however, some showing must be made that plaintiff was treated differently from similarly situated individuals of different racial groups." (citation omitted).

*See id.* at 255 & n. 9, 101 S.Ct. at 1094 & n. 9.

If LSC carries its burden, the government must then prove that the legitimate reason proffered by LSC was merely a pretext for discrimination. Pretext may be proven either "directly ... [by showing] that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. The burden of persuasion remains at all times with the government. *Id.* at 253, 256, 101 S.Ct. at 1093, 1095.

### 2. Allison Family

Dale Allison is white; her husband Dr. Anthony Allison is black; and their children Patricia, Vivian and Anita are part-black. Stip. 268–271; D. Allison, Tr. 6/15/88, at 6–7. The Allison family lived in Lansdowne from approximately 1968 to April 1988. Stip. 274; D. Allison, at 6.

The Allisons' thwarted attempts to gain admission into the Club prior to their first rejection in 1983 are probative of the motive for this rejection.[55] On April 19, 1976, Dale Allison wrote a letter to Club President H. Newton Walls in which she expressed an interest in joining the Club and asked for an application. Stip. 275; GX 1. Ms. Allison requested membership for her family so that her daughter Vivian could participate in Club activities with her friends who were members. D. Allison, at 8; V. Allison Testimony, Tr. 6/15/88, at 30. The Club did not respond to this request. Stip. 276.

Thereafter, Ms. Allison called Club Official Donald Solenberger,[56] who said that he had received her letter, that membership was closed for 1976 and that she could apply for the following year. D. Allison, at 8–9. His statement that membership was closed was not correct: after April 19, 1976, the date Ms. Allison's letter was sent, a non-black family requested associate privileges for 1976 and was approved. *See* GX 91 (request); GX 75, 91 (same family approved for full membership in subsequent year).

On November 23, 1976, shareholder member Donald Kidder wrote a letter to Mr. Solenberger, asking the Club to let him know the status of the Allisons' membership request and whether they should reapply or if their initial request would be on "hold" for the subsequent year. GX 40. The letter also expressly stated that Dr. Allison was black. *Id.* Mr. Kidder received no communication or acknowledgment in response to this letter. Kidder Testimony, Tr. 6/15/88, at 112.

On March 29, 1977, Ms. Allison sent President Walls another written request for membership, in which she provided the names and addresses of three Club shareholder members who were willing to sponsor her family. Stip. 278–279; GX 2. The Club did not respond to this letter. Stip. 280. In 1977, the Club responded to and admitted four non-black families who made membership requests on or after March 29, 1977. *See* GX 92, 93, 94 and 95 (requests) *with* GX 76 and 77 (approvals).

On July 10, 1977, Ms. Allison and a Club member went to President Walls' home. Stip. 281. Ms. Allison asked Mr. Walls why her family had not been admitted to the Club, a question which he did not directly answer. Stip. 282; D. Allison, at 9. He suggested that she write a letter to the Club requesting membership. Stip. 283.

On July 18, 1977, President Walls received, by registered mail, a letter dated July 12 from Ms. Allison regarding her family's interest in joining the Club. Stip. 284–285; GX 3, 4. The Club did not reply. Stip. 286.

On March 8, 1978, Ms. Allison sent the Club another request for membership, to which she received no response. Stip. 288–289; GX 5. On or about March 14, 1978, she filed a complaint against the Club with the PHRC, which alleged racial discrimina-

---

**55.** These events are not too remote to be relevant. *See infra* p. 818 n. 68.

**56.** In her testimony, Ms. Allison incorrectly identified Mr. Solenberger as Membership Chairman. D. Allison, at 8. This mistake is of no consequence.

tion in a place of public accommodation. Stip. 290–291. Ms. Allison again requested membership in a letter dated May 7, 1979, but was not admitted to the Club. Stip. 293–295. Membership Committee Chairman John Boyd testified that the Club decided not to process the Allisons' applications for 1978 and 1979 because Ms. Allison had filed the discrimination charge. Boyd Testimony, Tr. 6/17/88, at 34–35. There is no evidence that the Club communicated this reason to Ms. Allison or members of her family.

The Allison family applied for first-year associate privileges in 1983 but was rejected by the membership. I find that this rejection was motivated by racial animus.

The government made out a prima facie case of discrimination. First, the Allisons are a part-black family. Second, they met the qualifications of membership: they filed a timely request, completed an application, were interviewed by a member of the Membership Committee, tendered the requisite fee and were sponsored by two shareholder members. Stip. 296–310; GX 10–11. Third, they were rejected, with forty of the forty-two negative ballots containing the Allisons' name. Stip. 311; DX 18. Fourth, memberships were available and were given to non-black families: the Allisons were the only black or part-black family who applied and were the only family rejected for either associate or shareholder privileges. Stip. 223–228.

LSC set forth what it believed were two legitimate nondiscriminatory reasons for the rejection of the Allisons: their failure to receive 90% of the membership vote [57] and Ms. Allison's involvement in certain groups and activities. The failure to receive 90% of the membership vote was not a legitimate reason to reject the Allisons' application. Under *McDonnell–Douglas*, I must determine whether the rejection of an applicant was racially motivated; knowledge that the applicant failed to receive a certain number of votes does not assist me in this determination. *Cf. Aikens*, 460 U.S. at 716–17, 103 S.Ct. at 1482 (even though "sensitive and difficult", determination of state of mind of defendant must be made); *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038–40 (2d Cir.1979) (under *McDonnell–Douglas*, motivation of voting members must be tendered to rebut prima facie case). Otherwise, a membership could reject applicants because of their race and yet be immune from liability because the voting process could not be penetrated.

The second reason advanced by LSC was Ms. Allison's involvement in certain groups and activities. Ms. Allison belongs to the Religious Society of Friends. D. Allison, at 12. In 1976, when she first sought membership in the Club, she worked with unwed pregnant adolescents at the University of Pennsylvania. *Id.* at 15–16. A few years later, she became involved in the Lansdowne–Upper Darby Fair Housing Council. *Id.* at 16. She also participated in a peace demonstration in the center of Lansdowne, which was conducted by the Lansdowne Peace Council. *Id.* at 16–17. She filed her discrimination charge against the Club in 1978. Stip. 290–291. She appeared before the Lansdowne Borough Council on two or three occasions concerning alleged discrimination at LSC and was director of the Committee to Integrate the Lansdowne Swim Club. D. Allison, at 17–19.

Ms. Allison's activities and affiliations unrelated to the Club are legitimate, nondiscriminatory reasons [58] for her family's rejection, but those related to the Club are not. Her efforts to gain admission to the Club on a nondiscriminatory basis, includ-

---

57. The only reason for the Club's rejection of the Allisons expressed to them at that time was that they had failed to receive the approval of the members who voted at the Club's special meeting. GX 12.

58. My finding that these were legitimate nondiscriminatory reasons is limited to the context of this case—that is, a case alleging racial discrimination. I do not pass upon the question whether rejection of the Allisons because of Ms. Allison's membership in the Religious Society of Friends would constitute a separate Title II violation. The allegations in this case are limited to discrimination against blacks and the government does not contend that Title II was violated in any other respect. *See* Reply Brief, at 16 n. 10.

ing her legal action, were inextricably intertwined with the race of her family. Therefore, rejection of the Allisons on this basis constituted retaliation against them for attempting to enforce their right to become members of the Club without regard to race.[59]

The government sustained its burden of proving that the only nondiscriminatory reason advanced by LSC, Ms. Allison's activities and affiliations unrelated to the Club, was a pretext for discrimination. Although Ms. Allison admitted that she participated in these activities, there was no evidence that any of the members knew about them or voted against the Allison family because of them. The number of times prior to 1983 that the Club failed to respond to Ms. Allison's requests for membership also suggests that the 1983 rejection was racially motivated.

The Club's rejection of the Allisons' 1986 application also was due to their race. The government set forth a prima facie case of discrimination by showing that the Allisons were qualified to become associate members (Stip. 321–336; GX 15–20) and were rejected by the voting membership (Stip. 337; GX 21), and that all openings were filled by non-black families.[60]

The Club stated that the reason for this rejection was Ms. Allison's picketing of the Club. Ms. Allison admitted her participation in this activity. D. Allison, at 22–23. I find that this picketing, which protested alleged discriminatory practices of the Club, was not a legitimate nondiscriminatory reason to reject the Allison family, but constituted retaliation against them because they attempted to assert their right to enjoy the full enjoyment of Club privi-

leges without regard to race. *See supra* pp. 813–14.

### 3. Ryan Family

James and Thomasine Ryan are white. Stip. 346. They have three adopted children: two are of black and Mexican ancestry, and one is a dark-skinned Puerto Rican. Stip. 347–350. They have lived in Lansdowne since about 1980. Ryan Testimony, Tr. 6/15/88, at 46. The Ryans sought to join the Club because they wanted their children to swim at the pool. *Id.* at 49, 52–53.[61]

The Ryan family applied for first-year associate privileges in 1984, but were rejected by the membership. I find that they were rejected because two of their children are of black ancestry.

The government set forth a prima facie case of discrimination. First, the Ryans are a part-black family. Second, they qualified for first-year associate privileges: they filed a timely request, were interviewed, filled out an application, tendered the required fee, and were recommended by two shareholder members. Stip. 352–370; GX 29. Third, the Club rejected them, with twenty-eight of the twenty-nine ballots with negative votes including the Ryans' name. Stip. 371; GX 30; DX 20. Fourth, all but one of the non-black families applying for associate or shareholder memberships were admitted to the Club. Stip. 229–234; *see also infra* p. 817.

There is no direct evidence that Club members were aware that two of the Ryan children were of black ancestry. However, considering James Ryan's phone call to Richard Burke in which Mr. Ryan revealed that his children were Hispanic,[62] the inter-

---

**59.** Defendant contends that because a retaliation claim is not pled in the complaint, the government cannot now assert it. This argument is without merit. The government asserts retaliation not as an independent claim but as evidence to rebut a defense, to show that the reason offered by LSC was pretextual.

**60.** In 1986, all non-black families who applied for associate or shareholder memberships were accepted, whereas the three black or part-black families who applied for first-year associate

privileges were rejected. *See* Stip. 237–242; DX 24.

**61.** The Ryans have been members of the Drexelbrook pool since their rejection by LSC. *Id.* at 49–50.

**62.** Prior to applying to the Club, Mr. Ryan called Mr. Burke and told him that he had three Hispanic children, which he thought would make it a problem to join the swim club. Burke Testimony, Tr. 6/16/88, at 39–40. Mr. Burke responded, "to me that doesn't cause you any

view at the family's home and the subsequent call in which Thomasine Ryan asked the interviewer Mr. Boyd whether there were any minorities at the Club (Ryan, at 48–49), and the listing of the three Ryan children on the Notice to Members (DX 19), it is more likely than not that members of the Club were aware of the children's race.

LSC articulated the following reasons for rejecting the Ryans' application: Mr. and Ms. Ryan formerly were members of Roman Catholic religious orders and were involved in social causes such as the United Farm Workers. Ryan, at 60–61. I find that these were legitimate nondiscriminatory reasons for their rejection.[63]

The government, in turn, satisfied its burden to show that these reasons were pretextual. The Ryans did not participate in the above-mentioned activities in the Lansdowne area. *Id.* at 64. Ms. Ryan believed that her family was not generally known to the community, *id.* at 65–66, and LSC submitted no evidence to the contrary. Moreover, there is no evidence that, even if members were aware of this conduct, they voted against the Ryans because of it. It is not likely that the membership's rejection of the Ryans' application was based on activities that did not take place in the Lansdowne community.

The rejection of the Ryans' 1986 application also was motivated by intentional discrimination. The government's prima facie case was satisfied: the Ryans qualified for membership (Stip. 374–391; GX 31–37), their application was rejected (Stip. 392; GX 38), and openings for associate and shareholder memberships were available and filled by non-black families. *See supra* p. 814 n. 60.

LSC attempted to rebut the government's prima facie case by showing that 1) the Ryans were involved in picketing and other protests of what they perceived as discriminatory policies of the Club, and 2) the Ryan children acted inappropriately. In 1984, after their first application was rejected, the Ryans wrote letters to the press and distributed leaflets and picketed at the gate of the Club's parking lot to protest the Club's allegedly discriminatory policies. Ryan, at 53–56; DX 73–75. In July, 1984, the Ryans, along with others, picketed the business offices of the Club's Membership Chairman. Boyd Testimony, Tr. 6/17/88, at 44–45. They also participated in a demonstration at the Club by the Ethnic Labor Coalition of Philadelphia, an event that was covered by area news media. *See* DX 84. Mr. Ryan filed a charge with the PHRC and contacted the Department of Justice regarding his family's rejection from the Club. Ryan, at 58. I find, as I did concerning the Allisons' 1986 application, *see supra* p. 814, that the 1986 rejection of the Ryan family's application based on these activities constituted retaliation against them for their attempts to assert their right to enjoy Club membership without regard to race.

The inappropriate behavior of the Ryan children is a legitimate nonracial reason for the family's rejection. Mr. Burke testified that he voted against the Ryans in part because "I saw [the Ryan] children running around town in their diapers, running up and down Owen Avenue in their Big Wheels. I just didn't think it was the type of children that I wanted my children to swim in the same pool with." Burke Testimony, Tr. 6/16/88, at 48–49.

Mr. Burke has stated why he personally voted against the Ryans, and I find his testimony credible. However, the nonracial reason does not justify rejection by the entire membership. It is more likely that a discriminatory reason motivated the membership to reject the Ryans. There is no evidence that the behavior of the Ryan children was known to other members or motivated the overwhelming number of negative votes cast against the Ryans: of 98 negative ballots cast, 97 included the Ryans' name. *See* DX 24.

### 4. Ivery Family

Ellen and Harold Ivery and their two children are black. Stip. 394–396. Ellen

---

problems", and recommended that Mr. Ryan get involved with community affairs. *Id.* at 40.

**63.** *See supra* p. 813 n. 58.

Ivery is a clothing store assistant manager (Stip. 398) who has been actively involved in community organizations in Lansdowne for a number of years: she has volunteered at Girl Scouts, Boys' Club, Girls' Club, her church, the South Lansdowne Civic Association and the local schools. Stip. 399–401; Ivery Testimony, Tr. 6/15/88, at 32–33. Harold Ivery is an auto parts business owner who is also a senior volunteer with the Boys' Club. Stip. 402–403. Because of these various community activities, I find that the Iverys were known to members of the Lansdowne community and thus their race was also known. *See* Transcript of Oral Argument, Tr. 9/21/88, at 35.

The events which occurred prior to the Iverys' rejection in 1986 are probative of the Club's discriminatory intent. In February 1985, Ms. Ivery wrote to the Club's Membership Committee requesting a membership application for her family. Ivery Testimony, Tr. 6/15/88, at 35–36. Ms. Ivery wanted to apply to the Club because it had a good swim program that her son was interested in joining. *Id.* at 37–38. She received no response to this letter. *Id.* at 36.

Ms. Ivery then approached Richard Burke concerning the February 1985 letter: he stated that he had not received it. *Id.* at 37; Burke Testimony, Tr. 6/16/88, at 42–43. The Club received a letter from Ms. Ivery dated March 17, 1985, which was marked "Second Request". Stip. 404; GX 22. The Board of Directors had established March 10, 1985 as the deadline for processing inquiries from new applicants and thus this second request was received too late to process that year. *See* DX 8 (Minutes of Mar. 10, 1985).

The Iverys applied for first-year associate privileges in 1986, but were rejected by the membership. I find that this rejection was racially motivated.

The government made out its prima facie case of discrimination. First, the Iverys are black. Second, they qualified for membership: they filed a timely request for an application, a representative of the Club interviewed them, an application was completed, the appropriate fee was paid, and recommendations were submitted by two shareholder members of the Club. Stip. 409–422; GX 23–27. Third, the Club rejected their application. Stip. 423; GX 28. Fourth, openings for associate and shareholder memberships were available and all were filled by non-black families. *See supra* p. 814 n. 60.

The reason for the rejection offered by LSC[64] was that it was rumored that Ms. Ivery had sponsored a segregated "After-Glow" party for the William Penn School District's senior prom. Burke Testimony, Tr. 6/16/88, at 49.[65] Ms. Ivery testified that although she raised money for the Lansdowne–Aldan High School's post-prom "After–Glow" party and was also involved with another party, she was not involved with any segregated post-prom party. Ivery Testimony, Tr. 6/15/88, at 42–44. Therefore, LSC's reason amounts to an unsubstantiated rumor. Assuming that such rumor if substantiated could constitute a legitimate nondiscriminatory reason, I give it no weight absent evidence showing that the rumor was believed by the members and/or led members to vote against the Iverys' application. *See 12 Lofts Realty,* 610 F.2d at 1041. I also "bear in mind that rumors are easily started and, although perhaps facially neutral, may easily be advanced with discriminatory intent." *Id.* This is especially true here because the rumor related to the race of the Ivery family. Moreover, the Club's unjustified failure to respond to Ms. Ivery's February 1985 request supports the government's showing of discriminatory intent in 1986.

**64.** Another possible reason for the rejection of the Ivery family was that members perceived that the Iverys picketed with the Ryans and Allisons. Defendant's Brief, at 31. However, it is undisputed that the Iverys never protested against the Club in any way; if they had, that would not constitute a legitimate nondiscriminatory reason.

**65.** I do not understand why this reason would justify the membership's rejection of the Iverys. Notwithstanding my lack of comprehension, I will analyze this reason under the *McDonnell–Douglas* framework.

### 5. B Family

The B family, who are white, were granted associate privileges in 1980 and 1981. Stip. 338–341. During the 1981 swim season, Ms. B brought black guests to the Club. Second Additional Stipulation of Facts. In 1982, the Club rejected the application of the B family for shareholder membership. Stip. 343.

With only this evidence, the government has not proved that the Club rejected the B family in 1982 because Ms. B had brought black guests to the pool.

### 6. Johnson family

The Johnsons are a part-black family, *see supra* p. 808 n. 49, who were admitted as associates in 1981 (*see* DX 14) and as shareholder members in 1982 (*see* DX 16). The admission of the Johnson family into Club membership does not diminish the strength of the government's showing that the Club's rejection of the Allisons, the Ryans and the Iverys were part of a pattern or practice of discrimination. I need not find that LSC always discriminated to find that it engaged in a pattern or practice. *See supra* p. 807. The rejection of black and part-black families by LSC approaches the "inexorable zero." *See Teamsters*, 431 U.S. at 342 n. 23, 97 S.Ct. at 1858 n. 23.

### 7. Wilson Family

The Wilsons, a white family, were associate members of LSC in 1983. Wilson Testimony, Tr. 6/16/88, at 25. During the summer of 1983, after they had been granted associate privileges for that year, the Wilsons took a black infant into their home as a foster child. *Id.* at 25–26. In 1984, while this child was still living with them, the Club admitted them as associates. *Id.* at 26. They were granted associate privileges again in 1985, when the black foster child was no longer in their home. *Id.* at 26–27.

LSC offered this evidence to show that it did not discriminate. But the Wilsons were not a part-black family. The child in their home was a pre-adoption placement and

thus it was never contemplated that he would become a permanent member of the Wilson family. *Id.* at 28–29. The unique status of this child was reflected in the notice sent to the membership with respect to their 1984 application: the child's name was not listed as a family member. *See* GX 100. Moreover, the child was only five days old when he came into the Wilson's home and consequently never used the Club's facilities, although Ms. Wilson brought him into the pool area. Wilson, at 28.

Prior to the 1985 vote, the Wilsons wrote a letter advising the Membership Chairman that another black foster child would be in their home that summer. DX 38. However, this child had not entered the Wilson's household at the time of the annual voting meeting and did not become a member of the family even when she entered their home.

### 8. V Family

The V family, who is white, was rejected for associate privileges in 1984. Stip. 438, 441. This rejection is distinguishable from those of the black and part-black families and thus fails to counter the government's showing. First, unlike the rejected black and part-black families who were never permitted to become associates, the V family was granted associate privileges every year from 1977, when they first applied, to 1983. Stip. 263, 439–440. Second, it is undisputed that a number of Club members voted against the Vs because of perceived misconduct by the family. Stip. 442. Third, although the Club rejected the V family's application, a director's pass was made available to at least one of the V children to use the Club's facilities. Stip. 443; Burke Testimony, Tr. 6/16/88, at 38–39. No similar privileges were extended to the black and part-black families who were rejected.[66]

Finally, the rejection of one non-black family does not explain the rejection of all

---

**66.** The Club did not notify the Ryans that a director's pass was available to any member of their family. Stip. 393.

but one of the black and part-black families who have ever applied for associate privileges. During the thirty-year history of the Club, only three shareholder membership applications of non-black families (Stip. 255–256), and only one associate membership application of a non-black family have ever been rejected (Stip. 261).[67] Moreover, all of these non-black families were accepted into the Club at some time during the Club's history. *See supra* pp. 799–800 n. 31.

### 9. Number of Rejections

A pattern or practice of discrimination requires more than isolated or sporadic instances of discrimination. *See supra* pp. 805–06, 807. Although the number of discriminatory rejections in this case is small, the rejections are not merely isolated or sporadic because the small number is attributable to LSC's discriminatory reputation in the Lansdowne community and its deterrence of potential black applicants, which resulted in a small number of black applicants.

▆▆▆ Evidence of discriminatory reputation is not admissible to show that the defendant discriminated, but is admissible to show why more blacks did not apply. *See People of the State of New York v. Ocean Club*, 602 F.Supp. 489, 491 (E.D.N.Y.1984); *EEOC v. Sheet Metal Workers, Local 122*, 463 F.Supp. 388, 425–26 (D.Md. 1978); *United States v. Lee Way Motor Freight, Inc.*, 7 F.E.P. Cases 710, 748–49, 1973 WL 278 (W.D.Okla.1973); *United States v. Central Motor Lines*, 338 F.Supp. 532, 558–59 (W.D.N.C.1971). Two long-time black residents of Lansdowne, India Harris and Gloria Harrison, testified that as early as the 1960s the Lansdowne Swim Club had a reputation among blacks in the community of Lansdowne for racial discrimination. Harris Testimony, Tr. 6/15/88, at 152–54; Harrison Testimony, Tr. 6/15/88, at 158. Inez Parker, whose testimony is discussed in more detail *infra* p. 819, testified that she had "heard that they didn't want blacks around there [the Club], ..." Parker Testimony, Tr. 6/15/88, at 74.

The small number of black applicants also is attributable to conduct which deterred blacks from applying to the Club. *See infra* pp. 819–03.

### D. DISCRIMINATION IN ORGANIZATION OF CLUB

During the Club's organization in 1957 and 1958, the Club solicited membership applications from Lansdowne residents. Stip. 15.[68] When the founders did not receive enough applications to reach their initial goal of 300 members, they solicited applications from nonresidents. *See supra* pp. 802–03. However, the Club made no effort to solicit black residents of Lansdowne and the organizers did not recruit in the black area of Lansdowne. Richards Testimony, Tr. 6/16/88, at 136.[69] Significantly, blacks who inquired about membership in LSC were referred to the Nile Swim Club, *id.* at 127, which is located in Yeadon, PA and which is known as a "black" swim club. Young Testimony, Tr. 6/17/88, at 9–10. Given the view of the founders that the pool was open to anyone who could pay the membership fee, *see* Richards, at 136, these actions evince the Club's intent to exclude blacks.

---

67. The Club believes that it may have rejected another white family for associate privileges, but it cannot identify the name of the family. Stip. 262.

68. I find that events occurring prior to 1979, and even as early as 1957, are relevant to the government's cause of action. The government alleges a pattern or practice of discrimination in the Club's membership practices, *see* Complaint ¶¶ 7–8, an allegation not limited to the voting practices which have been in effect since 1979. When such a wide-ranging pattern or practice has been alleged, the Club's operations as a whole must be considered. *See, e.g., United States v. Dillon Supply Co.*, 429 F.2d 800, 804 (4th Cir.1970); *United States v. Buffalo*, 457 F.Supp. 612, 620–21 (W.D.N.Y.1978). Even acts and practices of the Club in existence prior to the passing of the Civil Rights Act are relevant, particularly since the Club's practices did not change subsequent to the passing of the Act in 1964. *See Bazemore*, 478 U.S. at 402, 106 S.Ct. at 3010 (Title VII); *Hazelwood*, 433 U.S. at 309–10 n. 15, 97 S.Ct. at 2742 n. 15 (Title VII).

69. At this time blacks lived primarily on the southeast side of Lansdowne. *Id.* at 126.

On November 4, 1957, prior to the beginning of the membership drive, the founders adopted a resolution, recommended to them by the Club's lawyers, that stated that any resident of Lansdowne regardless of race, creed or color was eligible for membership in the Club. *Id.* at 128–29; DX 5 (Minutes of Nov. 4, 1957). The passage of this resolution was not communicated to the membership. Richards, at 134. Although the adoption of this resolution is relevant to LSC's defense, it does not negate the government's showing that the Club's recruitment policy was discriminatory. In this instance, the Club's actions speak louder than its words, particularly when these words were not communicated to the membership or to the black members of the community.

## E. DETERRENCE OF BLACK APPLICANTS

The Club's deterrence of black applicants was an integral part of its discriminatory practice.

### 1. Parker Family

Inez Parker and her family are black. Parker Testimony, Tr. 6/15/88, at 70. Ms. Parker has resided in Lansdowne since December 1968, when her son was approximately eleven years old. *Id.* at 73, 75.

In the spring of 1969, Ms. Parker sent a letter to LSC to the attention of Membership Chairman Newton Walls, which was addressed to the Club's box number at the post office. *Id.* at 70–71, 75. In the letter she included her name and address, and stated that she was applying for any membership that was available. *Id.* at 71. She obtained three sponsors for membership: Ann Gravagno, Pat Guzzardo, and Fran Schultz. *Id.* at 72; Guzzardo Testimony, Tr. 6/15/88, at 78–80. Ms. Guzzardo, a shareholder member of the Club, wrote a letter to the Membership Chairman on behalf of the Parkers' application. Guzzardo,

at 85, 89–90.[70] The Club did not respond either to Ms. Parker's or Ms. Guzzardo's letters. Parker, at 72; Guzzardo, at 80.

I find that Ms. Parker's request was received by the Club. Ms. Parker testified that her letter was properly mailed. A letter shown to be properly mailed is presumed to be received by the addressee. *See Hagner v. United States*, 285 U.S. 427, 430, 52 S.Ct. 417, 418, 76 L.Ed. 861 (1932); *Paul v. Dwyer*, 410 Pa. 229, 188 A.2d 753, 755–56 (1963). Testimony by the addressee that he did not receive the letter, without more, does not rebut the presumption of receipt. *See Meierdierck v. Miller*, 394 Pa. 484, 147 A.2d 406, 408 (1959). By failing to reply to Ms. Parker's letter, the Club failed to adhere to its policy to respond to all inquiries concerning membership. Burke Testimony, Tr. 6/16/88, at 54; Boyd Testimony, Tr. 6/17/88, at 51–52.

I find that this failure to respond was due to the race of the Parker family. Although there is no evidence in the record that the Club knew that Ms. Parker was black, I conclude that members of the Club must have known her race in light of the evidence of regular nonresponses to the requests of other black and part-black families.

### 2. Reaves Family

The trial record does not reveal that the deposition of Charles E. Reaves was admitted; however, counsel agree that I admitted the deposition subject to LSC's objections. Oral Argument, Tr. 9/21/88, at 4–5.[71]

Charles Reeves is black. Reaves Deposition, GX 128, at 4. He and his family resided in Lansdowne from 1971 to 1978. *Id.* at 5. When Mr. Reaves moved to Lansdowne in 1971, the other members of his family were his wife and his daughter, who was six. *Id.* He desired membership in the Club so that his daughter could swim

---

**70.** There is no evidence that letters were actually sent to the Club by the other sponsors, although they agreed to write them. *Id.* at 79–80, 85–86.

**71.** Some of these objections were ruled on at trial. *See* Tr. 6/15/88, at 91–93. Defendant's objection that the President was not sufficiently identified is ruled on *infra* p. 820 n. 72. Defendant's objection to the admission of the hearsay statements of Ms. Reaves is sustained.

with her white friends who belonged to the Club. *Id.* at 7. In 1971, Mr. and Ms. Reaves went to see the President of the Club to request membership.[72] At this time, the Reaves provided the names of two sponsors and told the President that they were willing to pay the required fees. *Id.* at 10–12.

The President told the Reaves that there was a long waiting list for Club membership with a thousand names on it. *Id.* at 10, 12–13, 17–18.[73] He also told them that it would take a long time to become members and that he would get back to them. *Id.* at 10, 22–23. The President never said that an application form was required or that there were any other membership requirements that the Reaves had to meet. *Id.* 13–14, 22–23. The Club made no further response to the Reaves' request. *Id.* at 13.

I find that the statements concerning the waiting list were untrue and intended to deter the Reaves family from pursuing their membership application. There is no evidence that a waiting list for associates existed in 1971;[74] the minutes suggest that a waiting list was eliminated in 1963. GX 67. Moreover, I find it unlikely that, even if the Club had a waiting list, it would contain one thousand names. In 1980, the Borough of Lansdowne had only a total of 3,081 families living within its boundaries. GX 121.

### 3. Allison Family

I find that the Club's failure to respond to Ms. Allison's 1976–1979 requests for membership, *see supra* pp. 812–13, and the incorrect statement made by a Club officer to Ms. Allison in 1976, *see supra* p. 812, were intended to deter her from applying because of her family's race.[75]

### 4. Ivery Family

I find that the Club's failure to respond to Ms. Ivery's February 1985 request for membership, *see supra* pp. 815–16, also was racially motivated.

### 5. M family

To counter the government's proof that the Club failed to respond to the inquiries of black and part-black families in order to deter them from applying, LSC submitted evidence illustrating that it had failed to respond to the requests of a non-black family, the M family, who wrote two letters to the Club which apparently received no response. DX 83. This situation is readily distinguishable and thus fails to rebut the government's showing that the Club deterred black applicants. First, the Ms eventually were admitted into the Club as both associate and shareholder members. *Id.* In contrast, only one black or part-black family was ever admitted, regardless of how many times these families requested membership. Second, there is no evidence suggesting that the M's requests were received by the Club and purposefully disregarded, as the Allisons' 1976 and 1977 requests were.[76] Third, the record does not reveal that the Club made any misstatements of fact to members of the Morella family, as it did to the Reaves and to Ms. Allison.

---

72. I overrule defendant's objection based on insufficient identification of the President. Mr. Reaves' neighbors told him that he should see the President regarding membership and the neighbors identified the President. *Id.* at 8, 11. The Reaves went to a home they were told belonged to the President, they asked to see the President and the person they spoke to identified himself as the President. *Id.*

73. Mr. Reaves clearly stated that the President said there were one thousand names on the waiting list.

74. A waiting list for shareholder members may have existed at that time. DX 6 (Minutes of Feb. 21, 1971).

75. In 1976 Club members must have been aware of the race of Dr. Allison and the Allison children, although it is arguable that members were unaware of their race until the receipt of Donald Kidder's 1976 letter, *see supra* p. 812.

76. The Club admits that "there is no dispute that Mrs. Allison made repeated efforts to participate in the membership selection process because the LSC does have her letters of inquiry and she did visit Mr. Walls, LSC's president." Defendant's Brief, at 34.

## F. OTHER ANECDOTAL EVIDENCE

I do not give any weight to the other anecdotal evidence offered by the government to support its contention that the Club engaged in a pattern or practice of intentional discrimination against blacks.

### 1. Domestic Help Rule

 The Club prohibits the admission of domestic helpers unless they are members. *See* GX 56 (1962 Rules and Regs), 57 (1964 Regs), 58 (1978 Regs), 59 (1979 Regs), 60 (1986 Regs). The reason for this rule advanced by Club members, whose testimony I credit, was to prevent members and associates from leaving their children at the pool with a babysitter who did not have to pay a membership fee. Richards Testimony, Tr. 6/16/88, at 133–34; Weiss Testimony, 6/16/88, at 18. Domestic helpers may be admitted to the Club as guests if they are accompanied by a member. Weiss, at 18. I find that the Club's failure to drop this rule at the urging of certain Club members (*see* Biscontini Testimony, Tr. 6/15/88, at 136–37) was not motivated by racial animus.

### 2. Instruction of Boy Scouts at Nile Swim Club

 Mr. Richards conducted lifesaving instruction for white Boy Scouts at LSC but gave this instruction to black Boy Scouts at the Nile Swim Club. Richards, at 134–35. The black Boy Scouts were neither invited to nor attended lifesaving instruction at LSC. *Id.* at 135. However, the government has not shown that the reason for this practice was discriminatory. Mr. Richards, whose testimony I credit, stated that he would have offered to instruct them at LSC, but they belonged to the Nile Swim Club. *Id.* at 131.

### 3. Janet Ariza Testimony

 Janet Ariza testified that in 1971 she asked someone she believed to be an officer of the Club whether a black girl, who was going to be visiting her family for a month during the summer, would be per-

mitted to use the pool as a guest. The purported officer said that she would not. Ariza Testimony, Tr. 6/15/88, at 97–99. This testimony is entitled to no weight because Ms. Ariza was unable to identify either the officer or the acquaintances who referred her to the officer. *Id.* at 96, 98.

### 4. 1976 Kidder Resolution

 On November 17, 1976, Donald Kidder proposed to the Club's Board of Directors that it adopt a resolution instructing the Membership Committee "that no family shall be denied membership or consideration for membership solely on the basis of race." GX 39. The Board failed to adopt this resolution. Kidder Testimony, Tr. 6/15/88, at 109–10. The government has not shown that this inaction was motivated by racial animus. Mr. Kidder himself testified that the Board told him that the Club did not discriminate and therefore such a resolution was inappropriate and unnecessary. *Id.* at 110, 121.[77]

### 5. Letters to Club

 In the late 1970s and in 1984, Club members and area religious organizations wrote to the Club expressing their concern that the Club was engaging in racial discrimination and/or requesting that the Club take action against future discrimination. *See* GX 40, 42, 82, 83, 84, 85, 86. The fact that these letters were sent to the Club does not prove that it discriminated against blacks.

### 6. 1978 and 1984 Kidder Proposals

 On November 15, 1978, Mr. Kidder proposed the following changes in the membership procedures: applicants must be approved by two-thirds of the voting membership and members unable to attend the annual special meeting may vote by mail. GX 41; Kidder, at 113–16. The Club did not approve this proposal; however, it did amend the Bylaws to provide that members be approved by 90% of those present

---

77. Simply because the Board may have been unaware of the 1957 Resolution prohibiting dis-

crimination, *see id.* at 132, does not mean that its failure to act in 1976 was racially motivated.

and voting at the annual meeting. *See supra* pp. 798–99.[78]

At the special meeting of the membership held on August 2, 1984, Mr. Kidder again proposed the resolution set forth above. Stip. 168–170; GX 41. The Club did not approve this proposal; however, it did amend the Bylaws to require that one sponsor of an applicant be present at the annual meeting. Stip. 171–175.

The reason or reasons for the Club's failure to approve Mr. Kidder's proposal are unknown. Therefore, the government has not shown that the Club's failure to approve Mr. Kidder's proposal was motivated by intentional discrimination.[79]

### 7. Dyhan Cassie Testimony

■ In 1981, while the Cassie family was being interviewed for membership by John Boyd, Dyhan Cassie asked him if the Club was integrated. He responded, "oh no, ... it was not integrated .... it was only segregated because no black people had ever applied." Cassie Testimony, Tr. 6/15/88, at 103–04. Mr. Boyd had no specific recollection of this conversation with Ms. Cassie, although he testified that he usually tells prospective members that the Club is not integrated and not segregated. Boyd Testimony, Tr. 6/17/88, at 43–44. Assuming that Ms. Cassie's recollection of Mr. Boyd's statement is accurate, it is not sufficient to show intentional discrimination by the Club.[80]

### 8. Racist Comments by Club Members

■ At one of the annual voting meetings, a Club member asked if there were any "niggers" applying that year. Kidder Testimony, Tr. 6/15/88, at 119. At the special meeting of the membership held on

August 2, 1984 to discuss changes in membership policies because of concerns of discrimination in the Club, Ms. Biscontini, one of the members proposing these changes, was told by another member, "we don't need their kind and we don't need your kind either." Another member then said "nigger-lover". Biscontini Testimony, Tr. 6/15/88, at 135–37, 147–48. However offensive these statements may be, they express the views of the members who uttered them rather than a policy of the Club.

### 9. Proposal at 1984 Meeting

■ At the Club's Annual Meeting on November 15, 1984, a shareholder member suggested that the Club cure ill will by inviting qualified Lansdowne people of any race or religion to apply. GX 80, at 2. The Club's attorney advised that this action would jeopardize its private club status and that it should keep a low profile. *Id.* The rejection of this recommendation does not establish intentional discrimination, as it is consistent with the Club's belief that it was entitled to private club status and thus was not required to issue the proposed invitation.

### G. ADDITIONAL REBUTTAL EVIDENCE

First, the Club offered evidence that black or dark-skinned guests have been admitted to the Club without incident. Cunningham Testimony, Tr. 6/16/88, at 6–9a; Johnson Testimony, Tr. 6/17/88, at 15–16; Kressley Testimony, Tr. 6/17/88, at 21–22, 25–27. The government does not contend that the Club discriminates in its guest policies and practices, but in its membership policies and practices. United States' Post–Trial Supplemental Brief, at 6. Title II requires nondiscrimination in all of

---

**78.** Prior to 1978 the Board of Directors voted on applications for associate and shareholder membership. *See supra* p. 798.

**79.** I note that the existence of a subjective selection process controlled by whites may perpetuate discrimination and thus the failure to change such a process may support a claim of discrimination. *See, e.g., Green,* 843 F.2d at 1527–28; *Payne v. Travenol Labs.,* 673 F.2d 798, 824 (5th Cir.), *cert. denied,* 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982); *American Nat'l*

*Bank,* 652 F.2d at 1197–1200; Schlei & Grossman, at 191–92; *see also Sears, Roebuck,* 839 F.2d at 331–32 (citing cases). The government has not advanced this theory here.

**80.** However, his statement does demonstrate his understanding that no blacks had ever applied to the Club and that there were no black members of the Club prior to or at the time the statement was made. *See supra* p. 808 n. 48.

the privileges, advantages and accommodations provided by the Club, not simply the privilege of being a guest. *See* 42 U.S.C. § 2000a(a).

Second, the existence of other swim clubs in the area surrounding Lansdowne where black and part-black families could have obtained or did in fact obtain membership is irrelevant to whether LSC discriminated.

\* \* \* \* \* \*

In sum, I find that, upon consideration of all of the evidence and the applicable law, the government has sustained its burden of proving that the Lansdowne Swim Club has engaged in a widespread pattern or practice of discrimination against blacks from its inception to the present. When the Club was organized, it did not solicit blacks from the Lansdowne community and, when blacks inquired about membership, they were referred to the nearby "black" swim club. When black and part-black families requested or inquired about membership, the Club regularly failed to respond; the Club also had a reputation for discrimination, which deterred black and part-black families from applying. When black and part-black families satisfied the qualifications of Club membership, all but one were denied membership because of their race. "As [discriminatory] behavior has become more unfashionable, evidence of intent has become harder to find. But this does not mean that racial discrimination has disappeared." *12 Lofts Realty*, 610 F.2d at 1043 (citation omitted). The evidence in this case convinces me that such discrimination has existed in LSC.

## V. CONCLUSIONS OF LAW

1. The Lansdowne Swim Club is a place of public accommodation within the meaning of 42 U.S.C. § 2000a(b)(3), (b)(4).

2. The operations of the Club affect commerce within the meaning of 42 U.S.C. § 2000a(c)(3), (c)(4).

3. The Club is not a private club or other establishment not in fact open to the public within the meaning of 42 U.S.C. § 2000a(e).

4. The United States has sustained its burden of demonstrating that the Club has engaged in a pattern or practice of resistance to the full and equal enjoyment by black persons of the rights secured by 42 U.S.C. §§ 2000a to 2000a–6, and that the pattern or practice is of such a nature and is intended to deny the full exercise of these rights.

## VI. RELIEF

I will defer entering a remedial order until the defendant responds to the Revised Proposed Remedial Order submitted by the government.